IN THE COURT OF CRIMINAL APPEALS

OF TEXAS






AP-74,393






IRVING ALVIN DAVIS, Appellant


v.


THE STATE OF TEXAS







Appeal of Case 20010D06419 of the

168th Judicial District Court of

El Paso County





 Womack, J., delivered the opinion of the Court, in which Price, Johnson,
Holcomb, and Cochran, JJ., joined. Keller, P.J., filed a dissenting opinion, in
which Keasler and Hervey, JJ., joined. Meyers, J., dissented.


 The appellant was convicted of the June 23, 2002, murder of Melissa Medina in the course of
committing or attempting to commit aggravated sexual assault. (1) Pursuant to the jury's answers to the
special issues, (2) the trial judge sentenced the appellant to death. (3) The judgment of conviction and
sentence of death is subject to automatic review by this Court. (4)

 The appellant raises eleven points of error. We shall affirm the judgment of guilt, but reverse
and remand the case to the trial court on the issue of punishment.

I. SUFFICIENCY OF THE EVIDENCE OF GUILT


 In his fifth point of error, the appellant contends that the evidence is legally insufficient to
support the jury's verdict on guilt. He does not argue that the evidence is insufficient to show he
murdered Medina, but that the evidence is insufficient to show he did so while committing or attempting
to commit aggravated sexual assault. 

 In reviewing the legal sufficiency of the evidence, this court looks at all the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. (5) In this case, the relevant elements of
aggravated sexual assault are that a defendant intentionally or knowingly causes the penetration of the
female sexual organ of another person by any means, without that person's consent, and the defendant
causes serious bodily injury or attempts to cause the death of the victim or uses or exhibits a deadly
weapon in the course of the same criminal episode. (6) 

 The evidence at trial showed that on the night of June 3, 2001, Medina, the appellant, and some
friends gathered at the house of Amy Romero and her brother, Ben Romero. Amy testified she knew
Medina well, but had known the appellant for only two months. During the evening, the appellant told
Amy that Medina "had a nice butt." Amy asked the appellant to "leave [Medina] alone," but he refused
her request. The group talked and drank alcohol until approximately 12:20 a.m.

 The group then left the Romeros' house to walk Medina home. Half-way there, Medina told
the group she would walk the rest of the way home by herself. She often used a short-cut across an
elementary-school campus. The appellant decided to walk her the rest of the way home.

 When the appellant returned to the Romero house around 2:00 a.m., Ben noticed scratches on
the appellant's neck. 

 Alejandro Betancourt testified that he worked in the maintenance department of the Anthony
Independent School District. On the morning of June 4, 2001, he and a co-worker discovered
Medina's body on the school grounds. Her face was black and swollen, and her fingertips had been cut
off. 

 When first questioned by the police, the appellant stated that while he was walking Medina
home, a gray car pulled up, she got in it, and the car drove off. He claimed he received the scratches on
his neck during a fight with his brother days earlier. However, after speaking with his mother, the
appellant admitted to police that he strangled Medina. He claimed that while on the school grounds, he
and Medina began to have consensual sex, but she asked him to stop because she liked someone else.
The appellant told police that Medina said she would "cry rape" if he told anyone they had intercourse.
He claimed that he then "lost it" and strangled her. He also said he cut off Medina's fingertips because
she had scratched him and his DNA was under her fingernails.

 Dr. Corrine Stern, the medical examiner, performed an autopsy on Medina's body. With
respect to sexual assault, Stern testified that Medina had many injuries to her vaginal area, which
appeared to be caused around the time of her death, including "mucosal abrasions." In her opinion
those injuries were consistent with penile penetration, and she believed that Medina had been sexually
assaulted close to or at the time of her death. She also testified that Medina suffered blunt-force trauma
to her head, which resulted in a subarachnoid hemorrhage in her brain. She also found that Medina was
strangled and had numerous abrasions on her torso, including a particularly severe blow to the chest
that ruptured her pulmonary artery and filled her pericardial sac with blood.

 From the evidence of Medina's injuries and the medical examiner's testimony about them, the
jury could have reasonably inferred she was sexually assaulted. Viewing the evidence in the light most
favorable to the verdict, we hold that the jury could have found beyond a reasonable doubt that the
appellant murdered Medina during the course of committing or attempting to commit aggravated sexual
assault. Point of error five is overruled.

II. OTHER GUILT-PHASE ISSUES


A. Jury selection


 In his eleventh point of error, the appellant contends that the trial court erred in two different
ways during jury selection. First, he claims that the trial court erred in denying his challenges for cause
of prospective jurors Jerry Castillo and Yzela Sigala. Second, he argues that the trial court erred in
overruling his objections to the State's use of peremptory challenges on two other prospective jurors
pursuant to Batson v. Kentucky. (7) 

 Although Article 35.13 of the Code of Criminal Procedure requires that, in a capital case in
which the State has made it known that it will seek the death penalty, "a juror who has been held to be
qualified shall be passed for acceptance or challenge first to the state and then to the defendant," the
trial court allowed the parties to make peremptory challenges in the manner traditionally used in non-capital cases: all at once, after voir-dire examination of the entire panel was complete.

 For an appellate court to conclude that a defendant was harmed by the denial of a challenge for
cause, the record ordinarily must show that the defendant: (1) exhausted his peremptory challenges, (2)
made a request for more peremptory challenges that was denied, (3) exercised a peremptory challenge
against the complained-of juror (if he had a peremptory strike available to do so), and (4) identified an
objectionable juror who served on the jury. (8) 

 The record reflects that the appellant did not use a peremptory strike on either Castillo or
Sigala, and he had available strikes with which to do so. (9) Moreover, although during voir dire the
appellant requested additional peremptory challenges after his challenges for cause were denied -- and
those requests were denied -- he did not request additional strikes after he exercised his peremptory
challenges. We have previously indicated that, to be effective in demonstrating harm, a request for
additional strikes must be made after peremptory challenges have been exhausted. (10) There is a good
reason for this requirement: neither the trial court nor the parties are in a position to know whether
additional strikes are needed until after the defendant's original allotment of strikes is exhausted. We
conclude that the appellant was not harmed by the trial court's failure to grant his challenges for cause. 

 In the same point of error, the appellant argues that the trial court erred in overruling his Batson
v. Kentucky (11) objections to the State's peremptory challenges of prospective jurors Walter Lee
Murrell and Ericka Renae Bracey. Under Batson, a defendant must establish a prima facie showing of
racial discrimination in the State's exercise of its peremptory strikes. The burden then shifts to the State
to articulate race-neutral explanations for its questioned strikes. Once the prosecutor has articulated
race-neutral explanations, the burden shifts to the defendant to show that the explanations are really a
pretext for racial discrimination. The trial court must then determine whether the defendant has carried
his burden of proving racial discrimination. The trial court's determination is accorded great deference
and will not be overturned on appeal unless it is clearly erroneous. (12)

 When the appellant made his Batson challenges to the State's use of peremptory strikes on
Murrell and Bracey, the prosecutor offered race-neutral explanations for using the strikes. As for
Murrell, the State pointed out that he was "wishy-washy" with regard to his beliefs about the death
penalty and stated he would hold the State to a higher burden of proof. With respect to Bracey, the
State contended that she was aloof and hesitant in her answers, which gave prosecutors the impression
she could not follow the law. Further, she stated she knew someone who went to prison for "dropping
a baby" and minimized that person's conduct. Finally, she showed no emotion when describing her
service as a witness in a rape case. 

 When the burden shifted to the appellant to show that the State's explanations were really a
pretext for discrimination, the appellant made no attempt to rebut the prosecutor's race-neutral
explanations, and the trial court overruled the appellant's Batson challenges. The trial court did not
abuse its discretion in finding that the appellant failed to carry his burden of showing purposeful racial
discrimination. Point of error eleven is overruled.

B. Admissibility of Confession


 In his first point of error, the appellant argues the trial court erred in denying his motion to
suppress his confession. Specifically, he claims his confession should not have been admitted at trial
because police officers should have terminated his interview when he told them he wanted to go home.
As authority for his claim, the appellant relies on Miranda v. Arizona (13) and subsequent cases requiring
officers to "scrupulously honor" the invocation of Miranda rights.

 Miranda applies only to custodial interrogation. (14) A person is in "custody" for Miranda
purposes "if, under the circumstances, a reasonable person would believe that his freedom of
movement was restrained to the degree associated with a formal arrest." (15) When a person is in custody,
interrogation must cease if the person invokes one of the rights mentioned in the warnings required by
Miranda. (16) An accused's invocation of his rights must be unambiguous to trigger this requirement, and
officers are under no duty to clarify ambiguous remarks. (17) In determining whether the authorities failed
to comply with Miranda, we "afford almost total deference to the trial court's rulings on questions of
historical fact and on application of law to fact questions that turn upon credibility and demeanor while
we review de novo the trial court's rulings on application of law to fact questions that do not turn upon
credibility and demeanor." (18)
 

 At the hearing on the motion to suppress evidence, Detective Ron Nanos testified that he and
Detective Mark Graham arrived at the appellant's house in the early morning hours of June 5, 2001.
Nanos notified the appellant that he was working on a case and that he and the other detectives
working on the case had some questions for him. The appellant agreed to accompany Nanos and
Graham to the police station. Before they left, Nanos read the appellant his Miranda rights. The
appellant was not handcuffed on the way to the station, and when he and the detectives arrived, Nanos
again advised him of his Miranda rights. The appellant signed an acknowledgment of those rights.
While waiting for the other detectives assigned to the case to arrive, Nanos took the appellant outside
so that he could smoke a cigarette. 

 Detective Albert Licon testified that when he arrived at the station he met with the appellant,
who was not handcuffed. Licon showed the appellant the form he had signed acknowledging his
Miranda rights and asked him if he understood his rights. The appellant responded that he did, and he
then agreed to waive those rights and speak with Licon. They began to discuss the appellant's
whereabouts the night before and his interaction with Medina. The appellant told Licon that he walked
Medina through the neighborhood but did not walk her all the way home because she got into a gray
car. Licon then asked him about the scratches on his neck. The appellant said that he received the
scratches in a fight with his brother. A few minutes later, Licon stopped the interview to take a break,
and the appellant asked for a cigarette. Licon found him a cigarette and showed him outside to the
smoking area, where he left him unattended. Licon testified that the appellant was free to leave at this
point, had he wished to do so. When the interview resumed, Detective Sonia Vega accompanied Licon
to the interview room and began asking the appellant questions. Licon related that the appellant's
demeanor visibly changed when Vega was questioning him. While the appellant had been defensive
with Nanos, he seemed "shaken up" and "a little scared" of Vega. 

 Vega testified that when she began asking the appellant about the scratches on his neck, he
became very nervous and asked to go home for an hour to see his mother because he was concerned
about her health. The appellant told Vega that if he could leave for an hour, he would return and tell the
truth about what he had done. At this point, Licon asked the appellant: "Well, what are you saying at
this point? Do you want to terminate the interview? Is it that you want it to cease, to stop?" The
appellant answered, "No," that he just wanted to get this over with. Licon then called the appellant's
mother on the telephone and allowed him to speak with her. After the appellant finished speaking with
his mother, he agreed to continue the interview and confessed to killing Medina. Nanos stopped to
advise the appellant of his Miranda rights once again. The appellant indicated that he understood his
rights, waived them, and agreed to give a written statement.

 The trial court made findings of fact and conclusions of law that the appellant was not coerced,
threatened, or made promises in exchange for his statement. Further, the court found that the appellant
was coherent and understood what was happening while giving his statements. The trial court
concluded that he had been advised of his rights and had intelligently and voluntarily waived them. The
trial court also concluded that he was not in custody at the time he made the oral and written
statements. 

 Giving due deference to the trial court's assessment of the facts, we conclude that the appellant
was not in custody at the time the statements were made. The police did nothing to lead a reasonable
person to believe that he was restrained to the degree associated with a formal arrest. Dowthitt v.
State provides an illustrative contrast to this case. There, we found that "custody" of the defendant who
confessed had occurred, given the following factors: (1) stationhouse questioning had lasted for fifteen
hours, (2) the defendant's requests to contact his wife had been ignored, (3) the defendant had been
accompanied by law enforcement representatives on all restroom breaks, and (4) the defendant made a
crucial oral admission establishing probable cause to arrest. (19) 

 Although the present case also involved a crucial oral admission before the taking of a written
statement (and after the defendant had voluntarily accompanied the police to the station), the similarity
ends there. While Dowthitt admitted to being present at the murder in his case, the appellant admitted
he had been with the victim but said that she had left in a car. Also the appellant was not questioned for
an undue length of time, he was permitted an unattended smoke break outside the building, and he was
allowed to contact his mother. The manifestation of police control was not present here, as it was in
Dowthitt. 

 Because the appellant was not in custody, law enforcement officials had no obligation under
Miranda to scrupulously honor a request to terminate questioning. (20) Although Miranda warnings were
given (unnecessarily), that fact does not change the analysis. We have recognized that the prosecution
cannot impeach a defendant with his post-Miranda silence, even if Miranda warnings were given
prematurely. (21) This recognition was based on the idea that it is fundamentally unfair to make the implicit
promise that silence will carry no penalty and then to break that promise by using the defendant's
silence against him at trial. (22) The scrupulous honoring of rights, however, presents a different situation.
The need to scrupulously honor a defendant's invocation of Miranda rights does not arise until created
by the pressures of custodial interrogation. (23) Without those pressures, the police are free to attempt to
persuade a reluctant suspect to talk, and the immediate termination of the interrogation after the
invocation of rights is simply not required. (24)

 Moreover, even if the requirement to "scrupulously honor" an unambiguous invocation of
Miranda rights applied to the present case, that requirement was not violated here. In Dowthitt, we
held that a defendant's indication that he was too sick to continue did not constitute an unambiguous
invocation of his right to silence: his "statement merely indicate[d] that he believed he was physically
unable to continue -- not that he desired to quit." (25) Likewise here, the appellant's expression of
concern about his mother did not show that he actually desired to terminate the interview. To the
contrary, he expressed a desire to continue the interview once his concern about his mother had been
satisfied, and when expressly asked whether he wanted to terminate the interview, the appellant replied
that he did not. After the police responded to the appellant's concern by calling his mother and allowing
him to speak to her, he agreed to continue with the interview. Under these circumstances, the appellant
has not shown that he unambiguously invoked his right to silence. Point of error one is overruled.

 C. Charge on Confession


 In his second point of error, the appellant alleges the trial court erred in refusing to include his
requested instruction in the jury charge that the jurors were not to consider his confession for any
purpose if they found it had been obtained illegally. The appellant requested the following instruction:

 You're instructed that under our law, confession of a defendant may involve a
defendant [who] was in jail or other place of confinement, or in the custody of an
officer, shall be admissible in evidence if it appears that the same was freely and
voluntarily made without compulsion or persuasion, provided, however, that it be made
in writing, signed by the accused, and show that the accused is warned prior to making
such statement or confession by the person to whom the same is made. That, one, he
has the right to remain silent, not make any statement at all, that any statement he makes
may be used against him at trial; and two, any statement that he makes may be used as
evidence against him in court; and, three he has a right to have a lawyer present to
advise him prior to and during any questioning; and four, he may have his own lawyer.
If he's unable to employ a lawyer, he has the right to have a lawyer appointed to advise
him prior to and during any questioning. Five, he has a right to terminate the interview
or questioning at any time. Therefore, furthermore, the State must prove beyond a
reasonable doubt that agents of the State honored the rights mentioned above.
Therefore, if you believe the agents of the State did not honor defendant's request to
terminate the interview, if any, you will not consider the confession for any purpose.


He claims he was entitled to this instruction because there was some evidence that he invoked his right
to silence and to counsel during a custodial interrogation and that police did not honor those
invocations. 

 The alleged invocation of the right to silence involves the appellant's request to go home and
see his mother, and the facts surrounding that incident have been discussed earlier in this opinion. The
evidence introduced at trial on this matter was essentially the same as the evidence offered at the
pretrial motion-to-suppress hearing. With regard to the allegation that the appellant requested counsel,
the testimony he relies on came from his uncle, who quoted the appellant as asking the police, "Do I
need a lawyer?" This was asked while the appellant was still at his home. At trial, defense counsel also
relied upon the appellant's uncle's testimony that the police told the appellant "that he was just being
held for questioning." From the above-discussed evidence, defense counsel alleged at trial that there
was "at least a scintilla of evidence" that the appellant "was being detained" and that the defendant
made a "request for an attorney" and a "request to leave the police station house."

 The jury received the following instruction:

 You are instructed that unless you believe from the evidence beyond a reasonable
doubt that the alleged confession or statement introduced into evidence was freely and
voluntarily made by the defendant without compulsion or persuasion, or if you have a
reasonable doubt thereof, you shall not consider such alleged statement or confession
for any purpose nor any evidence obtained as a result thereof.


The State cites to Mendoza (26) for the proposition that a general instruction on voluntariness is all that is
required by Articles 38.22 and 38.23 of the Code of Criminal Procedure . 

 In Mendoza, we held that the defendant was not entitled under Article 38.22 to fact-bound
instructions that could constitute a comment on the weight of the evidence. (27) But the instructions in
Mendoza addressed two different areas of "voluntariness" law: compulsion and persuasion under
Article 38.21, and Miranda warnings under Article 38.22. (28) The appellant's requested instruction
pertained to the second area of law, but he received an instruction under the first.

 Article 38.22 and Article 38.23 each command that a jury instruction in conformity with its
requirements be given if an issue under that provision is raised by the evidence. (29) Assuming, without
deciding, that the appellant's requested instruction would be authorized by Article 38.22 or Article
38.23 in an appropriate case, we turn to whether the issue was raised by the evidence in the present
case. To merit a jury instruction on such issues, there must be "some positive evidence [that] appellant's
statements were coerced," (30) or the evidence must show a "factual dispute" over whether the appellant
had in fact invoked his right to counsel. (31)

 The testimony of the appellant's uncle raised a fact issue as to custody. (32) But no evidence
raised a fact issue regarding whether the appellant unambiguously invoked his right to terminate the
interview and his right to counsel. The appellant did not offer any evidence to controvert the testimony
offered by the State that he asked to go home to check on his mother, promised to come back when he
did, expressly denied that he wanted to terminate the interview, and agreed to resume the interview
after talking to his mother on the phone. Regarding the right to counsel, the appellant's uncle's
testimony shows only that the appellant asked if he needed an attorney. At least one court has held that
such a question does not rise even to the level of an ambiguous invocation of the right to counsel, much
less the unambiguous invocation now required to invoke the protections conferred by Miranda. (33) The
appellant's question was even more ambiguous than the statement found to be ambiguous by the
Supreme Court in Davis, (34) and a number of other courts have held that this kind of question does not
amount to an unambiguous request for counsel. (35) We hold that the question, "Do I need a lawyer?"
does not amount to an unambiguous request. Consequently, the uncle's testimony that the appellant
asked that question is not sufficient to raise a fact issue on whether the right to counsel was invoked.
Point of error two is overruled.

D. Post-arrest Silence


 In his eighth point of error, the appellant contends the trial court erred by allowing the State to
elicit testimony regarding his post-arrest silence in violation of the Fifth Amendment prohibition against
self-incrimination. At the guilt phase of trial, Dr. Kenneth Berumen, an emergency-room physician,
testified that he performed a medical evaluation of the appellant on June 4, 2001. When the prosecutor
inquired as to the appellant's demeanor during the evaluation, the appellant objected that the question
was "so insolubly ambiguous, [it] shouldn't even be received before the jury." The trial court overruled
the objection. 

 Berumen continued that the appellant was extremely quiet, would not maintain eye contact, and
would not answer questions about how he received his injuries. The appellant again objected. This time
he argued that, since he was in custody during his medical evaluation, the question violated the
appellant's Miranda rights and Articles 38.22 and 38.23 of the Code of Criminal Procedure. The trial
court reserved ruling on the objection until the State had a chance to ask a few predicate questions in
an attempt to qualify Berumen's characterization of the appellant's demeanor as a statement taken for
the purposes of medical treatment or diagnosis. After the State's predicate questioning, the trial court
sustained the appellant's objection. The appellant neither asked for an instruction to disregard
Berumen's prior testimony nor requested a mistrial. 

 In order to preserve error for appellate review, a defendant must object with sufficient
specificity to make the trial court aware of his complaint, (36) and he must pursue his complaint to the
point of obtaining an adverse ruling. (37) When the trial court sustains the defendant's objection, the
defendant must request an instruction to disregard if such an instruction would cure the error, (38) and, if
that request is granted, he must move for a mistrial. (39) Even if an instruction to disregard would not cure
the error, the defendant still must request a mistrial. (40) "It is well settled that when the appellant has been
given all the relief he requested at trial, there is nothing to complain of on appeal." (41)

 The appellant's "insolubly ambiguous" objection failed to alert the trial court to the Doyle
complaint he now advances on appeal. Even if assuming arguendo his second set of objections were
sufficient to make the trial court aware of his current complaint, he failed to preserve error for appeal by
failing to ask for an instruction to disregard and by failing to request a mistrial. Point of error eight is
overruled.

III. PUNISHMENT-PHASE ISSUES


 In his ninth point of error, the appellant claims that the evidence is legally insufficient to support
the jury's finding during the punishment phase that he would pose a future danger to society. We have
held that the facts of the crime alone may be enough to support an affirmative finding on the future
dangerousness special issue. (42) In addition to the circumstances of the case, other evidence, including
psychiatric evidence, may support the finding. (43) Taking into account the gruesome nature of the
offenses, which included cutting off the victim's fingertips, as well the State's expert testimony regarding
future dangerousness, we hold that a rational jury could have concluded that the appellant would be a
continuing threat to society. Point of error nine is overruled. 

 In his tenth point of error, the appellant argues that the trial court abused its discretion in
excluding the testimony of his lay witnesses regarding their opinions on whether the appellant would be
a future danger. At the punishment phase, when each of the appellant's witnesses was asked whether
he or she thought the appellant would pose a future danger, the State objected that only expert
witnesses were allowed to give that type of opinion. The trial court sustained the State's objections.
The appellant made a bill of exception, including the testimony of each of these witnesses that, in his or
her opinion, the appellant would not pose a future danger.

 The State concedes error. We shall therefore consider the issue of harm.

 In Potier v. State, we held that the improper exclusion of evidence is unconstitutional only if it
significantly undermines the fundamental elements of the accused's defense. (44) When the accused is able
to present the substance of his defense, the proper harm analysis is conducted under Rule of Appellate
Procedure 44.2(b), which states that any non-constitutional error that does not affect a substantial right
must be disregarded. (45) An error affects the defendant's substantial rights for Rule 44.2(b) purposes
when the error has "a substantial and injurious effect or influence in determining the jury's verdict." (46)
Conversely, an error does not affect substantial rights if the appellate court "has fair assurance that the
error did not influence the jury, or had but a slight effect." (47)

 The question of whether there is a probability that the appellant would commit criminal acts of
violence that would constitute a continuing threat to society (48) is the life-or-death question. The State's
witness, a psychiatrist, was permitted to express an opinion that a hypothetical person who had
committed a similar crime and whose social and criminal history was like the appellant's would be a
continuing threat to society. This court also has allowed lay witnesses who "knew the appellant and
were in a position to express the opinions they did" to give their opinions on the issue of future
dangerousness. (49)

 The opinions of nine lay witnesses who actually knew the appellant were erroneously withheld,
while the contrary opinion of an expert as to a hypothetical person was admitted. This shows a degree
of harm that is intolerable in a death-penalty case.

 We shall reverse the judgment of death and remand the case to the trial court for a punishment
hearing at which the appellant could present the evidence that we have held is admissible.

 Since we reverse, we need not reach the appellant's remaining points of error three (admission
at the punishment phase of a videotape recording of the crime scene), four (mention at the punishment
phase of photographs found in the appellant's bedroom), six (argument at the punishment phase), and
seven (the phrasing of a ruling during argument at the punishment phase).

 The judgment of guilt is affirmed. The judgment of death is reversed, and the case is remanded
to the district court for a new trial on punishment.


Delivered June 13, 2007.

Do Not Publish.
1. See Penal Code § 19.03(a)(2). 
2. See Code Crim. Proc., art. 37.071 §§ 2(b) & (e).
3. See id., § 2(g). 
4. Id., § 2(h).
5. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tello v. State, 180 S.W.3d 150, 150 n.1 (Tex. Cr. App.
2005). 
6. See Penal Code § 22.021. 
7. 476 U.S. 79 (1986).
8. Newbury v. State, 135 S.W.3d 22, 30-32 (Tex. Cr. App. 2004).
9. See id., at 32. 
10. Brooks v. State, 990 S.W.2d 278, 289 (Tex. Cr. App. 1999).
11. 476 U.S. 79 (1986).
12. Mathis v. State, 67 S.W.3d 918, 924 (Tex. Cr. App. 2002).
13. 384 U.S. 436 (1966).
14. Id., at 444.
15. Dowthitt v. State, 931 S.W.2d 244, 254 (Tex. Cr. App. 1996) (citing Stansbury v. California, 511 U.S. 318
(1994)).
16. Miranda, 384 U.S. at 473-74; Dowthitt, 931 S.W.2d, at 257.
17. Davis v. United States, 512 U.S. 452 (1994); Dowthitt, 931 S.W.2d, at 257.
18. Ripkowski v. State, 61 S.W.3d 378, 381-82 (Tex. Cr. App. 2001) (citing Guzman v. State, 955 S.W.2d 85, 89
(Tex. Cr. App. 1997)).

19. 931 S.W.2d, at 256.
20. Id., at 257.
21. Griffith v. State, 55 S.W.3d 598, 604 (Tex. Cr. App. 2001)("the Supreme Court held that it is a denial of due
process for officials to tell a defendant, even erroneously, that he has the right to remain silent and to speak to an
attorney, and then to use the resultant silence or request for an attorney as substantive evidence against him,"
(emphasis added), citing Doyle v. Ohio, 426 U.S. 610 (1976)); see also Doyle, 426 U.S. at 618, n. 9.
22. Griffith, 55 S.W.3d, at 604-05.
23. Beckwith v. United States, 425 U.S. 341, 346 (1976); Miranda, 384 U.S., at 457-58.
24. Dowthitt, 931 S.W.2d, at 254, 257; see also State v. Carroll, 645 A.2d 82, 87 (1994)(pre-custodial assertion
of right to remain silent, even after Miranda warnings given, does not require termination of interrogation); State v.
Lavoie, 562 A.2d 146, 149 (Me. 1989)(same); Davis v. Allsbrooks, 778 F.2d 168, 170 (4th Cir. 1985)(same).
25. Dowthitt, 931 S.W.2d at 257.
26. 88 S.W.3d 236 (Tex. Cr. App. 2002).
27. Id., at 240.
28. Id., at 237-38, nn.1-4.
29. Code Crim. Proc. art. 38.22, § 7; art. 38.23(a). 
30. Janecka v. State, 937 S.W.2d 456, 472 (Tex. Cr. App. 1996).
31. Dinkins v. State, 894 S.W.2d 330, 354 (Tex. Cr. App. 1995).
32. See Kaupp v. Texas, 538 U.S. 626, 630 (2003) (involuntary removal from home to police station constitutes
restraint equivalent to arrest).
33. United States v. Ogbuehi, 18 F.3d 807, 813-814 (9th Cir. 1994) ("Do I need a lawyer?").
34. Davis v. United States, 512 U.S. 452, 462 (1994) ("Maybe I should talk to a lawyer"); see also Dinkins, 894
S.W.2d, at 352 ("Maybe I should talk to someone" held more ambiguous than statement made in Davis).
35. State v. Dumas, 750 A.2d 420, 424 (R.I. 2000) ("Do I need a lawyer?"); Diaz v. Senkowski, 76 F.3d 61, 63-64
(2d Cir. 1996) ("Do you think I need a lawyer?"); Higgins v. State, 879 S.W.2d 424, 426-28 (1994) (same); State v.
Greybull, 579 N.W.2d 161, 163-64 (N.D. 1998) ("Do I need to get a lawyer?"); State v. Glatzmayer, 789 So. 2d 297,
304-05 (Fla. 2001) (defendant asked police if they thought he should have an attorney). 
36. R. App. P. 33.1(a)(1)(A).
37. Cook v. State, 858 S.W.2d 467, 473 (Tex. Cr. App. 1993); Young v. State, 137 S.W.3d 65, 69 (Tex. Cr. App.
2004).
38. Young, 137 S.W.3d, at 70.
39. Cook, 858 S.W.2d, at 473.
40. Young, 137 S.W.3d, at 70; Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Cr. App. 1996).
41. Cook, 858 S.W.2d, at 473.
42. Guevara v. State, 97 S.W.3d 579, 581 (Tex. Cr. App. 2003), Allridge v. State, 850 S.W.2d 471, 488 (Tex. Cr.
App. 1991).
43. Hayes v. State, 85 S.W.3d 809, 814 (Tex. Crim. Ap. 2002).
44. 68 S.W.3d 657, 666 (Tex. Cr. App. 2002).
45. Id.; R. App. Proc. 44.2(b). 
46. King v. State, 953 S.W.2d 266, 271 (Tex. Cr. App. 1997)(citing Kotteakos v. United States, 328 U.S. 750,
776 (1946)).
47. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Cr. App. 1998).
48. Code Crim. Proc., art. 37.071 § 2(b)(1).
49. E.g., Fierro v. State, 706 S.W.2d 310, 317 (Tex. Cr. App. 1986); Russell v. State, 665 S.W.2d 771, 779 (Tex.
Cr. App. 1983).