STATE

v.

Marc DUMAS.

No. 97–625–C.A.

Supreme Court of Rhode Island.

April 28, 2000.

Jane M. McSoley, Aaron L. Weisman, Providence, for plaintiff.

Paula Rosin, Providence, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

In deciding this appeal, we must determine whether the words "Do I need a lawyer?" or the words "Can I get a lawyer?" were uttered in the course of an interrogation by police. The defendant, Marc Dumas, has appealed from a judgment of conviction for murder in the second degree. Among his arguments on appeal, the defendant alleged that the trial justice erred by denying his motion to suppress his confession during questioning on the grounds that his previous unequivocal request for the assistance of counsel was denied. Because we hold that the condition of the evidence precludes us from deciding the critical issue of exactly

what the defendant uttered, we remand this case for expert analysis of the defendant's request.

### Facts and Procedural History

At six o'clock in the morning of November 9, 1990, an employee of Shaw's Meat Market in Woonsocket, Rhode Island, discovered the body of Diane Goulet behind the market. A rope or clothesline had been tied around the corpse's neck. The state's medical examiner later determined that the cause of death was ligature strangulation. For nearly five years the case remained unsolved.

At around 12:30 p.m. on October 16, 1995, defendant entered the Woonsocket police station and claimed to have information concerning the crime. During the next twelve hours, he gave police a detailed account of what had occurred at the time of the murder. Some portions of defendant's statement were videotaped. In summary, he claimed that in the early morning hours of November 9, 1990, after he and one Mike Jellison (Jellison) left a local bar, they saw the victim, whom they knew to be a prostitute. The victim agreed to accompany them to the rear of the market and engage in sexual activity with defendant. After this sexual activity was completed, Jellison stated that he wanted to kill the victim, and he began to choke her with his hands. The defendant claimed that he attempted to stop Jellison but was unsuccessful. The defendant also stated that after he and Jellison left the scene, Jellison warned defendant that he "knew a lot of people" and insinuated that defendant "would have a lot of problems" if he told anyone what had happened. While giving this statement, defendant indicated that there were some details he could not recall.

At some point between 11:30 p.m. and 12:30 a.m., while the video camera was turned off, the police officers decided to show defendant photographs of the victim's corpse in an attempt to trigger his memory. The defendant looked at the photos and told the police that he was the one who had tied the rope around the victim's neck. The police immediately stopped questioning defendant, advised him of his constitutional rights, and had him sign a rights form at 12:40 a.m.

At 12:50 a.m. the police resumed videotaping. Again, this time on videotape, defendant's constitutional rights were explained, and the officers asked him whether he wished to continue speaking with them. At some point during this interchange, defendant undisputedly used the word "lawyer." The exact context in which the word was used is a major point of contention in this case, and this issue will be discussed later. Following the reference to a lawyer, defendant gave an additional statement to the police in which he admitted that, believing that the victim already was dead, he acquiesced to Jellison's demands that defendant tie the rope around the victim's neck and that he engage in sexual contact with the corpse. According to defendant, Jellison "forced" him to perform these acts so that defendant would be implicated in the crime and thus would refrain from disclosing what he had witnessed.

On January 19, 1996, defendant was indicted and charged with murder,[1] and on July 3, 1996, he moved to suppress the statement he had given to the police. At the first hearing to consider this motion, the trial justice understandably was frustrated by the poor quality of the videotaped statements, and ordered that the parties obtain a transcript of any portions of the videotapes they wished to introduce. Although a transcript was obtained, there were numerous instances in which the transcriptionist was not able to determine what was being said because of the loud sound apparently of a manual typewriter

---

1. Although Jellison was arrested, he never was indicted, and was ultimately released. At oral argument, the state's attorney stated that the case was still open and that Jellison was considered a suspect.

being used close to the microphone. The state's attorney also attempted to have the tapes technologically enhanced, presumably by duplicating them on high quality video equipment.[2]

One week later, a second hearing was held to consider the motion to suppress. It was during this hearing, at which the videotapes were reviewed extensively, that all the parties first realized that defendant had made a reference to a lawyer before giving his final statement to the police. At this point, defense counsel maintained that defendant said, "Can I get a lawyer?" while the prosecutor contended that defendant asked, "Do I need a lawyer?" Later in the hearing, defense counsel moved for a continuance so the trial justice could appoint a neutral expert to determine what was said on this portion of the videotape. Characterizing this motion as "an eleventh[-]hour request," the trial justice denied the motion for a continuance. The trial justice went on to determine that neither the phrase "Can I get a lawyer?" nor "Do I need a lawyer?" constitutes an unequivocal request for counsel, and therefore concluded that the police did not violate defendant's constitutional rights by continuing to question him after the statement was made.[3] On that basis the motion to suppress was denied.

A trial was held in January 1997, and defendant was found guilty of second-degree murder. A motion for new trial was subsequently denied, and defendant was sentenced to fifty years, with thirty years to serve and twenty years suspended with probation.

On appeal, defendant alleged that the trial justice erred in not granting his motion for a continuance so that a neutral expert could determine the exact words used by defendant when he mentioned a lawyer. In the event that we were to determine that his statement concerning a lawyer was equivocal, defendant asked this Court to hold that under the Rhode Island Constitution, whenever police are confronted with an ambiguous reference to an attorney, they must ask clarifying questions to determine whether a suspect is attempting to exercise his or her right to counsel. Finally, defendant asserts that the trial justice erred by refusing to instruct the jury on mistake of fact because if the jury accepted defendant's claim that he believed the victim was dead before he tied the rope around her neck, this would serve as a legal defense to a charge of murder.

Additional facts will be discussed as necessary in the legal analysis of the issues raised.

## Standard of Review

When deciding a motion to suppress a confession, a trial justice can admit the confession against the defendant only "if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona*." *State v. Nardolillo*, 698 A.2d 195, 200 (R.I.1997). When this Court reviews a trial justice's denial of a motion to suppress, we give deference to the trial justice's factual findings and will reverse them only if they are clearly erroneous. *State v. Page*, 709 A.2d 1042, 1044 (R.I.1998). The question of whether a waiver of constitutional rights was voluntary, however, is a legal question, *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985), that we review *de novo*. *Page*, 709 A.2d at 1044. Finally, in the context of an alleged waiver or assertion of constitutional rights,

---

**2.** After reviewing both the original videotapes and the enhanced videotapes, it is our opinion that any improvement achieved by this enhancement was marginal at best.

**3.** The trial justice also determined that defendant's statements prior to his incriminating admission that he tied the rope around the victim's neck were non-custodial, and hence, the police were not required to inform defendant of his rights before speaking with him. The defendant has not challenged the denial of the motion to suppress in respect to those statements.

a trial justice's findings on mixed questions of law and fact necessarily must have an impact on constitutional issues, and pursuant to *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), we shall review those mixed questions of law and fact *de novo*. *State v. Campbell*, 691 A.2d 564, 569 (R.I.1997).

### Request for Counsel

The United States Supreme Court has determined that in order to safeguard the right against self-incrimination provided by the Fifth Amendment to the United States Constitution, a suspect who is subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning.[4] *Miranda v. Arizona*, 384 U.S. 436, 469–73, 86 S.Ct. 1602, 1625–27, 16 L.Ed.2d 694, 720–23 (1966). This right to counsel may be waived by the suspect after the police have informed the individual of his or her rights. *North Carolina v. Butler*, 441 U.S. 369, 372–73, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 291–92 (1979). If a suspect in custody makes an unequivocal request for counsel at any time, the United States Constitution requires that the police cease questioning until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981). The Supreme Court has also determined that under the Fifth Amendment, if a suspect makes an equivocal or ambiguous statement concerning an attorney, the police are not required to cease questioning and are permitted to continue the interrogation. *Davis v. United States*, 512 U.S. 452, 461–62, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362, 373 (1994).

The sole disputed issue concerning defendant's videotaped statement was wheth-er he attempted to assert his right to counsel. During the suppression hearing, the trial justice did not determine whether defendant said, "Can I get a lawyer?" or "Do I need a lawyer?" Although she did state that she heard, "Do I need a lawyer?" she also specifically stated that it was not necessary to make a finding on the issue at that time. Rather, when she ruled on the motion to suppress, she determined that "[e]ither interpretation of that sentence is not an unequivocal invocation of the right to counsel."

It is undisputed that the statement "Do I need a lawyer?" is a request for advice and is not an unequivocal request for counsel. *See Diaz v. Senkowski*, 76 F.3d 61, 63–64 (2nd Cir.1996) (holding that use of the words "Do you think I need a lawyer?" immediately following the words "I think I want a lawyer" rendered the request equivocal); *State v. Walkowiak*, 183 Wis.2d 478, 515 N.W.2d 863, 867 (1994) (holding that suspect's question "Do you think I need an attorney?" was equivocal). It is our opinion, however, that the question, "Can I get a lawyer?" could invoke a defendant's constitutional right to counsel under *Miranda*. The Supreme Court has given clear guidelines for determining when a statement concerning an attorney is an unequivocal assertion of the right to counsel:

> "The applicability of the ' "rigid" prophylactic rule' of *Edwards* requires courts to 'determine whether the accused *actually invoked* his [or her] right to counsel.' * * * To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. * * * Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can

---

4. The Rhode Island Constitution also provides for a right against self-incrimination. R.I. Const. art. 1, sec. 13. The defendant asks this Court to hold that the Rhode Island Constitution confers broader protection in this area than obtains under the United States Constitution. *See State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504, 523 (1994) (holding that the Hawaii Constitution offers broader protection of the right to counsel than provided by the United States Constitution). Our disposition of the case at bar, however, does not require us to determine at this time the exact bounds of the Rhode Island Constitution's protection of the right to counsel during custodial interrogation.

reasonably be construed to be an expression of a desire for the assistance of an attorney.' * * * But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

"Rather, the suspect must unambiguously request counsel. As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.' * * * Although a suspect need not 'speak with the discrimination of an Oxford don,' * * * he [or she] must articulate his [or her] desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 458–59, 114 S.Ct. at 2355, 129 L.Ed.2d at 371.

 We believe that the statement, "Can I get a lawyer?" could be sufficiently clear in some circumstances to meet this standard. In normal parlance, this syntactic phraseology is an acceptable and reasonable way to frame a request.[5] A suspect asserting his or her right to counsel need not speak with perfect formality, but may use any manner of colloquial speech, so long as his or her statement would be reasonably understood as a request for an attorney. The question of whether defendant's words here could be reasonably understood as a request for counsel is a mixed question of law and fact, to be determined in the first instance by a trial justice. Among the circumstances to be considered by the trial justice in making this determination must be the responses of the officers and any further utterances by defendant.

Thus, it is our opinion that a more exact analysis of the videotape interrogation must be made to determine precisely what defendant said when he used the word lawyer. If defendant made an unequivocal request for an attorney, then the United States Constitution dictates that all statements following that request should have been suppressed. In our *de novo* review of the evidence concerning defendant's statement, this Court was unable to ascertain by listening to and watching the videotape what defendant said. As we have discussed, the difference between the two putative questions could be significant. Therefore, we remand the case to the Superior Court for further factfinding on this issue. Accordingly, we direct that the Superior Court appoint a neutral expert who is qualified to obtain the best enhancement of the videotape that current technology can provide. The expert, in addition to ascertaining the statements on the videotape, also shall gather testimony from the police officers present during the questioning concerning their independent recollections of what was said on this issue during the interrogation of defendant. In presenting a considered opinion on what words defendant spoke, the expert can be questioned by the parties.

After examining all this evidence, the justice shall make a finding of fact on what was said by defendant and whether defendant's statement amounted to an unequivocal request for counsel. If the justice finds that defendant did make an unequivocal request for counsel, then in accord with *Edwards,* all statements following that request should be suppressed, and a new trial should be granted.

**5.** For example, a customer at a restaurant may ask the server, "Can I get a cup of chowder?" An impatient shopper might ask a sales clerk, "Can I get some service over here?" In each case, it is clearly understood that the speaker is making a request for a particular desired object or action. On the other hand, a patron at a pizza parlor might ask "Can I get a slice of pepperoni pizza?" and in that case the question might be understood to mean "Is pepperoni pizza available, and does this establishment sell pizza by the slice?" The reasonably-understood meaning of this phrase will depend upon the circumstances in which the words are uttered.

If, on the other hand, the justice determines that the defendant's statement was equivocal and therefore that his confession was properly admitted under the rule of *Davis,* the case shall be returned to this Court for our review. At that time, we shall also review the remaining issues the defendant has raised on appeal.

### Conclusion

Therefore, we sustain the defendant's appeal in part, insofar as we remand this case to the Superior Court for additional factfinding on his motion to suppress his confession, and we defer consideration of other issues raised on appeal pending the outcome of the remand. The papers of the case are remanded to the Superior Court for further proceedings consistent with this opinion.

Justice GOLDBERG did not participate.