STATE

v.

**Leroy ROBINSON.**

**No. 2006–322–C.A.**

Supreme Court of Rhode Island.

March 12, 2010.

Jane M. McSoley, Department of Attorney General, for Plaintiff.

Paula Rosin, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

On February 10, 2006, a Providence County Superior Court jury found the defendant, Leroy Robinson, guilty of two counts of first-degree child molestation sexual assault. On May 23, 2006, the defendant received two concurrent sentences of twenty years imprisonment, with nine years to serve and the remainder suspended, with probation.

On appeal, defendant contends that the trial justice erred in (1) denying his motion to suppress the confession that he made to a Providence police detective; (2) allowing into evidence certain testimony of the mother of the complaining witness, which testimony defendant contends violates the hearsay evidence rule; and (3) allowing into evidence certain testimony of the above-referenced Providence police detective concerning uncharged sexual acts, which testimony defendant contends vio-

lates two provisions of the Rhode Island Rules of Evidence.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

This case centers around allegations to the effect that defendant sexually molested a young man whom we shall call Steven.[1] The defendant was charged with two counts of first-degree child molestation sexual assault and one count of second-degree child molestation sexual assault, which assaults were allegedly committed between August 21 and 31 of 1999. We set forth below the most significant testimony given by various witnesses who testified at defendant's jury trial or at the suppression hearing that preceded the trial.

## A

### The Testimony of Tracey

Tracey (Steven's mother) testified at trial as a witness for the prosecution. She testified that, on the morning of August 10, 2003, she entered Steven's bedroom.[2] She stated that on that occasion she found Steven naked in bed with her stepson, Fred Jr.[3] She testified that, when she questioned them, the boys did not admit to having engaged in any inappropriate sexual conduct; she stated that they just said to her that "it was hot" and that "they

[had] only touched each other on the stomach."

Tracey further testified that, in the evening of August 10, she told Steven that she wanted to know the truth about what had occurred with Fred Jr. that morning. Tracey stated that, although Steven did not initially admit to having molested his stepbrother, he eventually made the following statement to her (as she recalled it): "I only did it because Leroy did it to me."[4] Tracey stated that she then called Fred Jr.'s mother (Valerie) to discuss what she had observed.

Tracey testified that, on the following day (August 11), she convened a family meeting in order to discuss what had occurred between Steven and Fred Jr. and to discuss how to proceed with regard to Steven's accusation concerning Leroy Robinson. Present at that meeting in addition to Tracey were her mother, Steven, Fred Sr. (Tracey's husband and Fred Jr.'s father), Fred Jr., and Valerie. Tracey testified that, at the family meeting, Steven and Fred Jr. admitted to having engaged in some inappropriate touching, but they denied having engaged in any oral sexual contact. She testified that, after discussing the accusation that Steven had made with respect to Leroy Robinson, the whole family group (including Steven) decided to go to Leroy's apartment in order to confront him with Steven's allegations of sexual abuse.

Tracey testified that, when she initially confronted Leroy, he denied having "violated" Steven; but she added that, when

---

1. We shall refer to the several non-party civilians involved in this case pseudonymously in order to protect their privacy.

2. Steven's date of birth is November 13, 1986. Accordingly, he was sixteen years old in August of 2003.

3. Fred Jr.'s date of birth is December 30, 1990. Accordingly, he was twelve years old in August of 2003.

4. It is uncontested that the "Leroy" referred to in Steven's accusatory statement was defendant, Leroy Robinson, who is the nephew of Steven's stepmother.

Leroy was face to face with Steven, Leroy admitted to having molested him. Tracey stated that defendant also told her that he himself had been molested in a group home. Tracey testified that defendant began to cry and that she then "smacked" him; she further testified that no one else struck defendant. She stated that soon thereafter her husband asked Valerie to summon the police.

## B

### The Testimony of Steven

Steven, the complaining witness, testified at trial that defendant is the nephew of his stepmother (Josephine); Josephine is married to Steven's father. Steven testified that, as a child, he often visited his father on weekends and that sometimes defendant would be there at the same time. Steven described his relationship with defendant as falling into the "fun" category; he testified that he and defendant would engage in such activities as playing games, wrestling, and riding in defendant's car. Steven testified that, from time to time while they were engaged in these activities, he and defendant would be joined by Steven's siblings and other relatives.

Steven further testified that his mother and his stepfather (Fred Sr.) were married on August 21, 1999 and that he stayed at his biological father's home for two or three days after the wedding.[5] According to Steven's testimony, while he and his brothers were staying at his father's home, defendant came to visit. When that visit was over, defendant drove Steven and his brothers to his own apartment, where he lived with his mother and his sisters.

Steven testified that he spent that August night at defendant's apartment and that he, his two brothers, and defendant all slept in the same bed in the living room. Steven stated that he awoke when he felt someone pulling his boxer shorts. Steven testified that it was defendant who was doing the pulling and that defendant proceeded to "put his mouth on [Steven's] penis." Steven further testified that he then performed a similar sexual act on defendant. Steven stated that, after the sexual acts were completed, he went back to sleep. Steven testified that he did not tell anyone what had occurred because he had "liked it."

Steven also testified that the just-described August 1999 sexual conduct was not the first time that defendant had engaged in oral sexual conduct with him; he stated that the first instance had occurred in the living room of his father's house when he was "about nine" years old. At that point in the trial, the trial justice instructed the jurors that they were not to consider Steven's testimony with respect to that prior sexual activity with defendant as evidence of defendant's bad character or as evidence that defendant had a propensity to commit such acts. The trial justice further instructed the jury that they could consider the evidence "to establish, if you believe this witness, the nature of the relationship between the witness and the defendant; [and/or] the disposition or intent of the defendant towards this witness, and for no other reason or no other purpose." The trial justice further instructed the jurors that they could not use Steven's testimony regarding sexual conduct with defendant when he was nine years old "to find him guilty of the charges that he is on trial for * * * today." Steven then proceeded to testify that, on that earlier occasion (when he was approximately nine years old), defendant had awakened him and had performed oral sex

---

5. In August of 1999, Steven was twelve years of age. *See* footnote 2, *supra.*

on him, after which Steven had performed oral sex on defendant; Steven added that defendant then masturbated both himself and Steven.

Steven testified that he did not tell anyone about defendant's conduct until August of 2003, when he told his mother that defendant had previously molested him; Steven was sixteen years old at that time.[6] Steven testified that his reason for making the August 2003 disclosure to his mother (Tracey) was because she had (in Steven's words) "walked in on [him] molesting [his] step-brother" (Fred Jr.). It was further Steven's testimony that he told his mother that "Leroy did the same thing to me."

## C

### The Testimony of Detective Miele

Detective Robert Miele of the Providence Police Department testified at the hearing on the motion to suppress defendant's confession.[7] According to Detective Miele's testimony, as of the time of the suppression hearing he had been a member of the Providence police force for twenty-two years and had served in various capacities; he said that, in August of 2003, he was serving in the "special victims unit." He testified that, on August 11, 2003, he was telephoned by Officer Michael Long, who informed him that he had responded to a call that necessitated an investigation into allegations of child molestation. Officer Long stated to Detective Miele that he had with him the complaining witness as well as the suspected perpetrator and several other people connected with the case. Detective Miele testified that he instructed Officer Long to bring them all to the station. He testified that Officer Long then detained defendant and transported him to the Providence police station;[8] he added that Steven and the other witnesses were also transported to the police station.

Detective Miele stated that, at the police station, he first spoke briefly with Officer Long and then proceeded to speak with Steven, his mother (Tracey), and his stepfather (Fred Sr.). The detective added that, while he was engaged in conducting the just-referenced interviews, defendant was held in a locked cell in the detention area of the police station. Detective Miele stated that, when he finished conducting those witness interviews (a process which the detective estimated lasted approximately thirty to forty minutes), he proceeded to interview defendant.

In describing his August 11, 2003 interview of defendant, Detective Miele testified that he removed defendant from his cell in the detention area and brought him to an interview room, which he described as being a plain room with a window; he said that the room contained a table, sev-

---

6. Steven incorrectly stated during his testimony that he was seventeen years old in August of 2003 when he made the disclosure that is referenced in the text. It is undisputed, however, that Steven's date of birth is November 13, 1986; it is therefore clear that he was sixteen years old in August of 2003.

7. We shall summarize Detective Miele's testimony at the suppression hearing in the "Facts and Travel" portion of this opinion, due to the fact that the correctness (*vel non*) of the trial justice's denial of that motion is the first issue before us on appeal. A portion of the detective's *trial* testimony is the subject of another

appellate argument and will be discussed toward the end of this opinion.

8. There is a lack of clarity in the record as to whether defendant was in fact under arrest when he was transported to the police station by Officer Long. However, the question of just when defendant was technically placed under arrest (as opposed to merely being detained) is of no moment with respect to the resolution of the legal issues in this case. We shall proceed under the assumption that this was a custodial interrogation.

eral chairs, and a mirror. The detective added that the only exit from the interview room is locked from the outside. Detective Miele testified that, upon bringing defendant into the interview room, he handcuffed him to a bar attached to the wall. He stated that it is his practice to handcuff to the wall every suspect who comes to the interview room. The detective testified that it is standard police procedure (something that he said is "always" done) to leave one hand free and one hand cuffed to the wall. Detective Miele further stated that a suspect is handcuffed at "a comfortable level, pretty much even with the table." The detective testified that he also offered defendant water and attempted to make him "as comfortable as possible."

Detective Miele stated that he proceeded to interview defendant "solo." He testified that he sat at the table with defendant and read him his *Miranda*[9] rights from the standard rights form used by the Providence Police Department. Detective Miele stated that defendant informed him of his date of birth and said that he had completed high school; this information was then recorded on the rights form. Detective Miele testified that he stated aloud to defendant that he was suspected of having committed first-degree child molestation; the detective added that he also wrote that fact on the rights form. Detective Miele recalled that defendant "was nodding his head [indicating that] he understood" as the detective was reading aloud to him the various rights that are printed on the rights form. The detective stated that, after he had read aloud all of the rights set forth on the rights form, he asked defendant if he understood his rights; he testified that defendant replied, "Yes, I do." The detective said that he then asked de-

fendant to initial each of the statements on the rights form so as to indicate that he understood the statements; he testified that defendant did so.[10] He stated that defendant then checked the box on the rights form which indicated that he understood his rights and then proceeded to sign the rights form. Detective Miele estimated that the process of apprising defendant of his rights took approximately ten minutes.

Detective Miele testified that he and defendant then began to discuss the allegation that defendant had sexually molested Steven. The detective testified that defendant initially told him that he "only taught him [Steven] how to masturbate;" the detective added that defendant said that the teaching about masturbation had occurred "years ago"—when Steven was "nine or ten years old." The detective further testified that defendant, after admitting to having taught Steven how to masturbate, also stated that "later on there was some oral sex involved;" it was further the detective's testimony that defendant then added that he "never penetrated [Steven]." Detective Miele testified that defendant informed him that he and Steven performed oral sex on each other "over a period of years." Detective Miele testified that, when he asked defendant where those sexual acts had taken place, his reaction was as follows (in the detective's words):

> "Mr. Robinson started to get very upset, very emotional, crying, sobbing, and it was very, very hard at that point to get anything more out of Mr. Robinson during [that] interview."

The detective further testified that defendant admitted that the above-referenced

---

**9.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**10.** A copy of the rights form signed by defendant was admitted into evidence as a full exhibit at the suppression hearing.

sexual acts occurred on various occasions and at more than one location.

Detective Miele testified that, as the interview proceeded, defendant became "more and more distraught" and eventually asked: "Am I going to need a lawyer?" The detective stated that, in response to that question, he said: "Yes, you are." He testified that he then asked defendant whether he wanted to make a formal written statement, and defendant responded by asking the detective whether "he really need[ed] a lawyer." It was Detective Miele's testimony that he replied: "Yes, you need a lawyer." The detective stated that, at that point, defendant made it clear that he did not want to give or sign any statement. Detective Miele testified that he then ended the interview and returned defendant to the detention area. The detective said that he also indicated on the rights form that defendant wanted an attorney. Detective Miele testified that the entire interview, including the time required to apprise defendant of his rights, lasted approximately thirty-five minutes.

The detective explained that, when he began to read defendant his rights, defendant was "visibly shaken, very distraught" and "was very upset." Detective Miele stated that, although defendant was upset and crying at times, he was "coherent" and "very loud [and] very clear;" it was his view that defendant appeared to understand the questions that he was being asked. The detective further testified that, although he described defendant as having been "upset," he "didn't seem so upset [that] he wasn't making any sense." Detective Miele explained that, although defendant was "in pretty good shape" when the detective read him his rights, he "started getting progressively worse" and

became "more distraught" as the interview proceeded. Detective Miele further testified that he neither coerced nor threatened defendant in any way. The detective stated that he had treated defendant "like a gentleman;" he added that defendant had similarly treated him "like a gentleman" and that the two of them "had a good dialogue going on."

In response to defense counsel's questioning about the fact that there was no contemporaneous recording of defendant's statements, Detective Miele testified that both audio and video recorders were available within the police station; he added, however, that he did not make either an audio or video recording of the above-referenced interviews with defendant or the witnesses. The detective further testified that he also did not take any written notes while interviewing defendant or the witnesses. As for his own written statement, Detective Miele testified that approximately twenty-five minutes elapsed between the time when he returned defendant to the detention area and the moment when he began to prepare his own statement. He testified that he did not refer to any notes when he composed his statement, adding that what defendant had said to him "was fresh in [his] mind."

## D

### The Indictment

On January 20, 2004, a grand jury charged defendant with two counts of first-degree child molestation sexual assault in violation of G.L.1956 § 11–37–8.1 and one count of second-degree child molestation sexual assault in violation of § 11–37–8.3.[11] Each count indicated that the alleged child

11. The single count of second-degree child molestation was ultimately dismissed by the prosecution at the conclusion of the state's case-in-chief.

molestation offenses were committed between August 21 and August 31 of 1999.[12]

## E

### The Motion to Suppress Defendant's Confession

The defendant having filed a motion to suppress the confession that he made to Detective Miele in August of 2003, a hearing was held in the Superior Court with respect to that motion on February 3, 2006. (The jury had not yet been impaneled.) Detective Miele was the only witness to testify at the hearing. The defendant contended that the prosecution had failed to meet its burden of demonstrating the voluntariness of his confession. At the conclusion of the hearing, the trial justice denied defendant's motion.

## F

### The Trial

A jury trial was held in the Providence County Superior Court from February 6 to February 10, 2006. The jury heard the testimony of Steven, Tracey, Fred Sr., Detective Miele, and Dr. Carole Jenny (a physician at Hasbro Children's Hospital who examined Steven in connection with the allegations of sexual abuse). On February 10, 2006, the jury found defendant guilty on both counts of first-degree child molestation sexual assault. The defendant filed a timely notice of appeal to this Court.

## II

## Analysis

### A

### Voluntariness of the Confession

The defendant contends that the prosecution failed to establish that his confession to Detective Miele was made after a knowing, intelligent, and voluntary waiver of his right against self-incrimination, which right is protected by the Fifth Amendment to the United States Constitution. The defendant also contends that the following factors cumulatively demonstrate that his confession was not knowing, intelligent, and voluntary: (1) his emotional state when he was interviewed by the detective, which he said was exacerbated by the fact that he was handcuffed to the wall during the interview; and (2) what defendant characterizes as the unreliability of Detective Miele's testimony due to a lack of contemporaneous electronic recording or note-taking by the detective. The defendant further contends that the question "Am I going to need a lawyer?" that he posed to Detective Miele after he had confessed to criminal conduct demonstrates that he did not understand his rights and that he was emotionally unable "to rationally assess his situation" and to waive his rights in a knowing, intelligent, and voluntary manner. The defendant additionally contends that the trial justice's failure, in ruling upon the motion to suppress, to mention the absence of a contemporaneous electronic recording or note-taking by the detective during the interrogation constitutes a disregard of a "critical part" of the totality of the circumstances analysis.[13] The defendant contends that

12. It should be borne in mind that the complaining witness, Steven, was twelve years old when the sexual acts that defendant was charged with having committed allegedly occurred. *See* footnote 2, *supra*.

13. "The determination of whether or not a confession was freely and voluntarily made

must be made in light of the totality of the circumstances surrounding the challenged statement." *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I.1998); *see also Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (stating that "the determination whether statements obtained during custodial interrogation are admissible

the absence of such recording and/or note-taking should have been given considerable weight in the trial court's voluntariness analysis.

### 1. Standard of Review and Analytical Process

■ When ruling on a motion to suppress a confession, the trial justice should "admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona* [384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ]." *State v. Bido*, 941 A.2d 822, 835 (R.I.2008) (internal quotation marks omitted); *see also State v. Taoussi*, 973 A.2d 1142, 1146 (R.I.2009); *State v. Dennis*, 893 A.2d 250, 261 (R.I.2006); *State v. Dumas*, 750 A.2d 420, 423 (R.I. 2000); *State v. Humphrey*, 715 A.2d 1265, 1274 (R.I.1998); *State v. LaRosa*, 112 R.I. 571, 575, 313 A.2d 375, 377 (1974).

In our review of a trial justice's ruling with respect to a motion to suppress a statement that allegedly was made involuntarily, "we employ a two-step analysis." *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835.

■ Our initial step is to review the trial justice's findings of historical fact relative to the issue of the voluntariness of the confession. *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835. We defer to the trial justice's findings of historical fact unless those findings are clearly erroneous. *Taoussi*, 973 A.2d at 1146; *Humphrey*, 715 A.2d at 1273. We have stated that a finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *LaRosa*, 112 R.I. at 576, 313 A.2d at 377; *see also Taoussi*, 973 A.2d at 1146; *State v. Perez*, 882 A.2d 574, 588 (R.I.2005).[14]

■ If we conclude that the trial justice's findings of historical fact were not clearly erroneous, we proceed to the second step of our analysis. At that second step, we "apply those historical facts and review *de novo* the trial justice's determination of the voluntariness of the statement." *Bido*, 941 A.2d at 836; *see also Taoussi*, 973 A.2d at 1146–47; *Humphrey*, 715 A.2d at 1274.[15] We have indicated that a statement is *voluntary* "when it is the product of [the defendant's] free and rational choice." *Humphrey*, 715 A.2d at 1274 (internal quotation marks omitted); *see also Taoussi*, 973 A.2d at 1147. By contrast, we have indicated that a defendant's statement is *involuntary* if it was "extracted from the defendant by coercion or improper inducement, including threats,

against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation"); *State v. Taoussi*, 973 A.2d 1142, 1147 (R.I.2009) ("When called upon to determine whether or not a statement was voluntary, this Court looks at the totality of the circumstances surrounding the challenged statement." (Internal quotation marks omitted.)).

14. When we are confronted with a mixed question of law and fact that has an impact on a constitutional issue, our review is *de novo* in nature. *State v. Dumas*, 750 A.2d 420, 424 (R.I.2000); *see also State v. Campbell*, 691 A.2d 564, 569 (R.I.1997) (stating that "[t]his Court will review *de novo* legal questions and mixed questions of law and fact insofar as those issues impact on constitutional matters").

15. We conduct a *de novo* review of a trial justice's determination of voluntariness due to the fact that the "question of whether a confession was given voluntarily is legal in nature * * *." *State v. Dennis*, 893 A.2d 250, 261 (R.I.2006).

violence, or any undue influence that overcomes the free will of the defendant." *Humphrey*, 715 A.2d at 1274; *see also Taoussi*, 973 A.2d at 1147. In making our *de novo* determination with respect to the voluntariness of a confession, this Court examines the "totality of the circumstances surrounding the challenged statement." *Humphrey*, 715 A.2d at 1274; *see also* footnote 13, *supra*. In doing so, we will exercise our "independent judgment in determining whether [the] historical facts establish a deprivation of constitutional rights." *Humphrey*, 715 A.2d at 1274.

## 2. Analysis

In spite of defendant's assertion that a cumulative aggregation of factors rendered his confession involuntary, we have reached the same conclusion as did the trial justice—*viz.*, that Mr. Robinson's confession was voluntary.

With respect to the first step of the analytical process described in the preceding subsection, we do not perceive any basis for ruling that the trial justice's findings of historical fact were clearly erroneous. In denying defendant's motion to suppress, the trial justice heard the testimony of one witness (Detective Miele) and reviewed one piece of documentary evidence (the rights form).

The trial justice noted that, after defendant was transported to the police station, he was placed in a room that the trial justice deemed to be "a reasonable area [in which] to conduct an interview * * *." The trial justice also found that the detective's act of handcuffing defendant to the wall while interviewing him at the police station was not in itself a coercive tactic; rather, the court found that such a practice served the cause of safety. The trial justice additionally noted the absence in the record of anything suggesting that "defendant was upset as a result of being handcuffed to the wall."

The trial justice also found that defendant was troubled and tearful from the outset of the interview and that he became increasingly more emotional as the interview continued. The trial justice further found that Detective Miele apprised defendant of his rights *before* the substantive interview began. The trial justice additionally noted that defendant's question to the detective as to whether he needed a lawyer reflected the fact that defendant had been apprised of his rights.[16] The trial justice also noted that defendant's question about whether he needed an attorney came *after* he had confessed to having sexually molested Steven.

The trial justice summarized as follows his findings as to the "atmosphere" in which the interview at the police station took place:

> "[T]he overall action here does not appear to be deliberate or coercive, and it doesn't appear that the defendant was tricked or misled in any way by the officer. There appears to have been an exchange between two individuals in an atmosphere that was neither fearful, nor unduly coercive."

We perceive no basis for holding that the above-summarized findings of historical fact by the trial justice were clearly erroneous.

■ Accordingly, we now proceed to review in a *de novo* manner the trial justice's

---

16. The rights form that was read to defendant and signed by him specifically indicates that the suspect has "the right to the presence of a lawyer, and to talk with a lawyer before and during any questioning." It further advises the suspect that if he or she "cannot afford a lawyer and [he or she wants] a lawyer, a lawyer will be appointed * * * at no cost * * * before any questioning."

application of his findings of historical fact to the issue of voluntariness *vel non*. *See Bido*, 941 A.2d at 836. We have carefully considered defendant's arguments; but, based upon our own review of the record of the suppression hearing, we are fully satisfied as to the voluntary nature of defendant's incriminating statements to Detective Miele.

To begin our review concerning voluntariness, we note that it was established in the record that Detective Miele brought defendant to an interview room and handcuffed one of his hands to the wall for safety. This Court expressly held in *State v. Humphrey*, 715 A.2d 1265 (R.I.1998), that such a practice did not negate the voluntariness of a confession. *Id.* at 1275 (stating, in the course of upholding the voluntary nature of the defendant's incriminating statements, that the use of restraints during interrogation was "no more confining or inhumane than those that are placed on prisoners from the ACI [Adult Correctional Institutions] who appear before this Court pro se"); *see also State v. Hall*, 940 A.2d 645, 656 (R.I.2008). We are unable to perceive any meaningful basis for departing from the rationale of *Humphrey*, and we consider the holding in that case to be dispositive with respect to the handcuff issue in this case.

The defendant also contends that his emotional state, which he describes as being "in the throes of a severe emotional breakdown," negates the knowing and voluntary nature of his confession. It is his contention that his "highly charged emo-

tions" demonstrate that his confession could not have been the product of his "free and rational choice." [17] Taking into account the trial justice's careful findings of historical fact, we are not persuaded that defendant's emotional state rendered him unable to "knowingly, intelligently, and voluntarily" [18] waive his right against self-incrimination. The trial justice found that defendant was "to some extent upset and agitated or tearful at times from the time he was brought into the room and that [that condition] gradually seemed to increase as time went on." The trial justice's findings were founded upon a plethora of evidence in the record and clearly indicate that defendant's apparent emotional breakdown occurred both *after* he had reviewed and waived his *Miranda* rights and *after* he had confessed to having engaged in oral sexual acts with Steven.[19]

Detective Miele's testimony is unrefuted that, although defendant was upset while his rights were read to him, he was nonetheless "coherent." Detective Miele further testified that defendant was able to provide him with his personal information and also was able to participate in what the detective characterized as "a good dialogue." According to the detective's testimony at the suppression hearing, it was only *after* defendant confessed to having engaged in sexual conduct with Steven that he became increasingly upset emotionally. In view of the trial justice's findings of historical facts and Detective Miele's testimony, we are unable to conclude that defendant's emotional state ren-

---

**17.** The words "free and rational choice" appear in this Court's opinion in *Humphrey*, 715 A.2d at 1274 (internal quotation marks omitted).

**18.** *State v. Bido*, 941 A.2d 822, 835 (R.I.2008) (quoting *Dumas*, 750 A.2d at 423).

**19.** *Cf. State v. LaRosa*, 112 R.I. 571, 575–76, 313 A.2d 375, 377–78 (1974) (holding not clearly erroneous the trial justice's finding of fact that the "defendant was overcome by emotional stress" during the *entire* interrogation and upholding the trial justice's conclusion that the defendant's waiver of her *Miranda* rights and her subsequent confession were not freely and voluntarily made).

dered him unable either to knowingly waive his *Miranda* rights or to confess in a knowing, intelligent, and voluntary manner.

The defendant further contends that his question "Am I going to need a lawyer?" demonstrates that he did not understand his rights and therefore could not have validly waived them. We are unpersuaded by this contention. The defendant was a high school graduate, and Detective Miele's testimony was clear that, although defendant was crying at times, he was "coherent" during the reading of his rights. There is no indication in the record that, as the detective reviewed those rights with him, defendant chose to ask the detective any questions or sought to clarify any of his rights.[20]

It is an undisputed fact that, when the interview eventually progressed into terrain that was more problematic for defendant, he chose to ask the detective whether he was going to need a lawyer.[21] However, the fact that the seriousness of his predicament dawned on defendant in the midst of the interview process

prompting him to inquire of the detective as to his need for legal assistance in no way indicates that he did not understand *ab initio* (*i.e.*, when his rights were read to him) that he had the "right to the presence of a lawyer * * *." The fact that defendant chose not to invoke his "right to the presence of a lawyer" at the outset does not mean that he did not understand that he had such a right. Upon reviewing the entire record, we are convinced that defendant at all pertinent times understood his *Miranda* rights.

■ The defendant's final contention with respect to the motion to suppress his confession is that the trial justice's analysis of the voluntariness issue failed to give sufficient weight to the fact that Detective Miele did not take notes or use an audio or video recording device while interviewing defendant.[22] We consider this argument to be unavailing. It is not a constitutional requirement that, in order for a confession obtained during a custodial interrogation to be deemed voluntary, it must have been contemporaneously recorded.[23] Although

---

**20.** Detective Miele further testified that defendant "was nodding his head [to signify that] he understood" while the detective, who was seated right next to him, read defendant his *Miranda* rights aloud to him.

**21.** It will be recalled that, *after* having confessed to Detective Miele that he had engaged in inappropriate sexual contact with Steven, defendant asked the detective: "Am I going to need a lawyer?" Detective Miele responded in the affirmative to that question—as he did to the subsequent question by defendant, asking whether "he really need[ed] a lawyer."

Since Detective Miele's questioning of defendant ceased when these questions were posed, we need not and do not decide whether either or both of said questions constituted an unequivocal request for counsel. *See Dumas*, 750 A.2d at 424 (holding that a defendant's "statement 'Do I need a lawyer?' [was] a request for advice and not an unequivocal request for counsel").

**22.** We recognize that it is not defendant's contention that the confession should be suppressed solely because it was not contemporaneously recorded. The defendant acknowledges that the police in this jurisdiction are not legally required to record custodial interrogations as a precondition for statements made by suspects during the interrogation to be admissible in court. Instead, defendant contends that, in ruling upon the suppression motion, the trial justice "did not place nearly enough weight on" the lack of recording devices or note-taking by the detective during his interview with defendant.

**23.** It is important to note that neither the United States Supreme Court nor this Court has ever held that due process requires that a custodial interrogation must be contemporaneously recorded. *See United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir.2004) ("[W]e see no hint that the Supreme Court is ready to take such a major step. We there-

it is true that the trial justice, in the course of denying the motion to suppress, did not mention the absence of an audio or video recording or contemporaneous note-taking, we are unable to conclude that this lacuna in his articulated rationale undermines his determination that the confession was voluntary. It is our opinion that the trial justice properly considered "the totality of the circumstances surrounding the challenged statement." *See Humphrey*, 715 A.2d at 1274. The fact that he did not comment on *the absence* of a particular not-legally-required aspect of the interview does not render his review of the historical facts (or his conclusion of law based thereon) less than adequate. We have applied those same historical facts in a *de novo* manner, and we have reached the same conclusion as did the trial justice—*viz.*, that Leroy Robinson's incriminating statements were the product of his "free and rational choice" (*Humphrey*, 715 A.2d at 1274) and therefore were voluntary. *See Taoussi*, 973 A.2d at 1147.

It is our definite opinion that Detective Miele's conduct during his interview of defendant respected defendant's *Miranda* rights. When the circumstances of that interview are viewed as a whole, it is clear to us that defendant's confession was voluntary. The detective apprised defendant of his rights; he used no coercive tactics; and, when defendant asked whether he needed a lawyer and then refused to execute a written statement, the detective promptly ended the interview. We therefore conclude that there is clear and convincing evidence in the record to support a determination that defendant knowingly and voluntarily waived his *Miranda* rights and confessed to having sexually molested Steven.

### B

### Tracey's Trial Testimony

■ The defendant contends that the trial justice erred in permitting Steven's mother, Tracey, to testify (over objection) that, later in the same day on which she had found him and her twelve-year-old stepson (Fred Jr.) unclothed in bed together, Steven stated to her: "I only did it because Leroy did it to me." The defendant alleges that this testimony by Tracey was inadmissible hearsay evidence because it was offered to prove the truth of the matter asserted; he also contends that the testimony does not fall within any exception to the hearsay rule. In contrast, the prosecution contends that Tracey's statement was not hearsay because it was not offered for the truth of the matter asserted, but rather was offered to show "the jury how the entire chain of events * * * was set in motion." The prosecution further contends that, if this Court should find Tracey's statement to be violative of the hearsay evidence rule, it should deem it to be harmless error and not prejudicial to defendant as being "merely cumulative."

Even if the quoted statement by Tracey was violative (in whole or in part) of the rule against hearsay evidence [24] and the trial justice erred in admitting said statement, we would consider the trial justice's error in allowing this testimony to be harmless beyond a reasonable doubt. *See Perez*, 882 A.2d at 590.

fore decline [the defendant's] invitation to enlarge *Miranda* so as to require the electronic recording of all interrogations.").

The issue of whether or not interrogations should be recorded has been the subject of continuing provocative scholarly commentary. *See, e.g.,* Lisa C. Oliver, *Mandatory Re-cording of Custodial Interrogations Nationwide: Recommending a New Model Code,* 39 Suffolk U.L.Rev. 263 (2005).

**24.** *See* Rule 801(c) and Rule 802 of the Rhode Island Rules of Evidence.

■ This Court has stated that "[i]t is well established that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when defendant's guilt is sufficiently established by proper evidence." *State v. Lynch*, 854 A.2d 1022, 1032 (R.I.2004) (internal quotation marks omitted); *see also State v. Micheli*, 656 A.2d 980, 982 (R.I. 1995). We have defined "cumulative evidence" as being that which tends "to prove the same point to which other evidence has been offered." *Lynch*, 854 A.2d at 1032 (internal quotation marks omitted). When we seek to determine whether or not a particular piece of evidence is cumulative, "the test is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." *Id.*

After careful review of the record, we conclude that Tracey's testimony was merely cumulative. Tracey's testimony did not reveal anything other than what Steven himself had already testified to at trial—at which time he was subjected to cross-examination by defendant's counsel. *See Lynch*, 854 A.2d at 1032. Accordingly, we conclude that the admission of Tracey's statement, even if it was inadmissible hearsay, constituted harmless error beyond a reasonable doubt.

### C

### The Testimony of Detective Miele

■ The defendant also contends that the trial justice erred in allowing the following portion of Detective Miele's trial testimony:

"[Prosecutor]: What do you recall with respect to the time frame that [Steven] had talked to you about concerning the acts?

"[Defense Counsel]: I object.

"The Court: Overruled.

"[Detective Miele]: He stated they had ended when he was approximately thirteen years old."

The defendant contends that the just-quoted testimony constituted inadmissible hearsay and also violated Rule 404(b) of the Rhode Island Rules of Evidence.

■ We agree with defendant that the testimony constituted inadmissible hearsay. The statement was offered to prove the truth of the matter asserted (*viz.*, that the sexual acts between defendant and Steven continued until Steven was approximately thirteen years old), and no exception to the hearsay evidence rule applies. However, just as we have held with respect to Tracey's testimony, Detective Miele's testimony was merely cumulative of Steven's own testimony at trial. Steven expressly testified at trial that, when he was interviewed on August 11, 2003 by Detective Miele, he informed the detective that he and defendant had engaged in sexual acts until he was "thirteen o[r] fourteen." [25] It is clear, therefore, that the above-quoted testimony by Detective Miele did not reveal any information beyond what Steven had already testified to at trial, at which time he was subjected to cross-examination. *See Lynch*, 854 A.2d at 1032. After taking into consideration the cumulative nature of the detective's statement, as well as the brevity and lack of specificity of the contested testimony, we conclude that the admission of the quoted hearsay testimony by Detective Miele was harmless beyond a reasonable doubt.

---

**25.** The defendant has not raised as an issue on appeal the admission of Steven's own testimony at trial to the effect that his sexual encounters with defendant lasted until he was "thirteen o[r] fourteen."

■ The defendant further contends that, in addition to being violative of the hearsay evidence rule, the testimony of Detective Miele constituted impermissible Rule 404(b) evidence.[26] *See State v. Merida*, 960 A.2d 228, 236–37 (R.I.2008). The defendant first points to the principle that evidence of uncharged sexual offenses is inadmissible if it is offered to establish that defendant had a propensity towards engaging in such conduct, and he contends that the detective's statement does not fall within any of the recognized exceptions to Rule 404(b)'s general exclusionary language. The defendant further contends that, even if the testimony should be deemed admissible, it was improper for the trial justice not to give a limiting instruction to the jury.

This Court has repeatedly stated that "[e]vidence of a defendant's prior sexual misconduct may not be admitted to prove that the defendant has a propensity towards sexual offenses and is, therefore, probably guilty of the crime charged." *Merida*, 960 A.2d at 237; *see also State v. Quattrocchi*, 681 A.2d 879, 886 (R.I.1996). However, this Court has also recognized in certain sexual assault cases that "evidence of other not too remote sex crimes with the particular person concerned in the crime on trial may be introduced to show the accused's 'lewd disposition or * * * intent' towards the person." *State v. Jalette*, 119 R.I. 614, 627, 382 A.2d 526, 533 (1978) (quoting *People v. Kelley*, 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947, 955 (1967)); *see also State v. Sorel*, 746 A.2d 704, 706 (R.I.2000); *State v. Gomes*, 690

A.2d 310, 316–17 (R.I.1997); *State v. Toole*, 640 A.2d 965, 970–71 (R.I.1994); *State v. Tobin*, 602 A.2d 528, 531 (R.I.1992). In our judgment, Detective Miele's testimony can properly be characterized as evidence of defendant's lewd disposition or intent vis-à-vis Steven. We therefore conclude that the admission of the challenged portion of the detective's testimony did not violate Rule 404(b).

■ The defendant's final contention with respect to Detective Miele's testimony is that the trial justice failed to give a proper limiting instruction to the jury. This Court has frequently stated that when Rule 404(b) evidence is admitted "the trial justice must instruct the jury on the limited purpose for which the evidence may be considered." *Merida*, 960 A.2d at 239; *see also State v. Hopkins*, 698 A.2d 183, 185 (R.I.1997). However, this Court has further stated that "it is not required that the instruction be given immediately after the pertinent testimony." *Merida*, 960 A.2d at 240; *see also State v. Cardoza*, 649 A.2d 745, 748 (R.I.1994) (stating that "there is no requirement that this instruction be given immediately after the testimony has been given").

■ The record reflects that the trial justice gave two limiting instructions with respect to the jury's consideration of uncharged sexual acts. The first limiting instruction was given immediately after Steven's testimony regarding his first sexual encounter with defendant when Steven was nine years old. The second limiting instruction was given in the trial justice's

---

**26.** Rule 404(b) of the Rhode Island Rules of Evidence reads as follows:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."
*See State v. Merida*, 960 A.2d 228, 232 n. 8 (R.I.2008) (discussing the term "Rule 404(b) evidence").

final instructions to the jury; that instruction also addressed only how the jury should deal with the testimony concerning the just-referenced encounters when Steven was nine years old.[27] We are therefore in agreement with defendant that the trial justice erred in failing to give the jury a limiting instruction with respect to the testimony of both Steven and Detective Miele regarding sexual acts allegedly committed *subsequent* to the dates set forth in the indictment. However, after a careful review of the record, we conclude that the admission of the testimony without a limiting instruction was harmless beyond a reasonable doubt because of the presence of ample evidence on the record to support a conviction.[28]

## III

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to that tribunal.

27. Both limiting instructions informed the jury that it was not to consider the encounters when Steven was nine years old as evidence that defendant is a person of bad character or criminal propensity and therefore must have committed the crime charged. The jury was instructed that it could consider the encounters for a limited purpose—*viz.*, the nature of defendant's relationship, intent, or disposition towards Steven.

28. *See State v. Lopez*, 943 A.2d 1035, 1043 (R.I.2008) (citing *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also State v. Perez*, 882 A.2d 574, 590 & n. 25 (R.I.2005); *State v. Gomes*, 881 A.2d 97, 105 (R.I.2005).