June 29, 2018

**Supreme Court**

No. 2016-151-C.A.
(P2/15-1538AG)

State                :

v.              :

Willie Washington.      :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                  :

v.             :

Willie Washington.      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Willie Washington, was found guilty by a jury of four offenses in connection with a shooting that occurred in Providence on November 15, 2014.[1] Following the denial of his motion for a new trial, the defendant was sentenced to a total of sixty years to serve, with twenty years of that sentence designated as nonparolable. On March 8, 2016, the defendant timely appealed from the judgment of conviction.

This appeal has traveled somewhat of an unusual course since it was docketed. Approximately one year after the appeal was filed, on April 28, 2017, defendant filed in this Court a motion to hold the appeal in abeyance and remand the matter to the Superior Court to allow him to seek a new trial based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963); the state objected. This Court denied defendant's motion to hold the appeal in abeyance, but granted the remand motion. This Court remanded the portion of the record necessary for the

---

[1] The offenses are: count 1, carrying a firearm without a license, in violation of G.L. 1956 § 11-47-8(a); count 2, assault with a dangerous weapon by discharging a firearm and causing injury to Rudy Basquez, in violation of § 11-47-3.2(b)(2); count 3, possession of a firearm with a previous federal court conviction, in violation of § 11-47-5; and count 4, assault with a dangerous weapon, in violation of G.L. 1956 § 11-5-2.

Superior Court to hear and decide defendant's *Brady*-related motion for a new trial. On June 19, 2017, a hearing on the alleged *Brady* violation was held before the same justice of the Superior Court who presided over defendant's trial. Four days after the hearing concluded, defendant filed a motion to recuse the trial justice. The trial justice held a hearing on defendant's recusal motion on June 26, 2017; and, on July 19, 2017, the trial justice issued a decision denying both the *Brady*-related motion for a new trial and the recusal motion.

This matter is again before this Court. The defendant now challenges his conviction on five grounds, contending that the trial justice erred by: (1) denying defendant's motion to suppress two witnesses' show-up identifications; (2) admitting the recording of an anonymous 911 call at trial; (3) "failing to implement the letter and spirit of this Court's remand order" in the trial justice's consideration of defendant's *Brady* claim; (4) failing to find that the state withheld information in violation of *Brady* after dialing the anonymous 911 caller's phone number and speaking with an individual prior to trial; and (5) denying defendant's motion to recuse. After careful consideration of defendant's arguments and a thorough review of the record, we affirm the judgment of conviction.

## I

### Facts and Procedural History

### A

### The Shooting

It is undisputed that on November 15, 2014, at approximately 1 a.m., Rudy Basquez, Jr., a food-delivery driver, was shot in the arm in a road-rage incident. Basquez was driving on Huxley Avenue in Providence after making a food delivery on the Providence College campus when he saw his brother, Michael Pickering, a food-delivery driver for another establishment,

parked on Huxley Avenue. Basquez stopped his vehicle next to Pickering's, and the two conversed; in doing so, they blocked traffic in both directions. During their conversation, a dark-colored SUV pulled up behind Basquez's car, and its driver yelled profanities and repeatedly honked the SUV's horn because Basquez's vehicle was blocking his passage. Basquez and the driver of the SUV both exited their vehicles and a verbal argument took place. As Basquez and the SUV driver returned to their respective vehicles, Basquez observed the passenger door of the SUV open and heard "multiple pops"; Basquez suffered a gunshot wound to his arm. The SUV subsequently drove off.

## B

## Pretrial Motions

## 1

## Show-Up Identifications

Prior to trial, defendant sought to suppress identifications made by two percipient witnesses. At a hearing on defendant's motion, the following evidence emerged.

### Testimony of Laura Ferretti and Brianna Sheetz

On the evening of November 15, 2014, Laura Ferretti and Brianna Sheetz were visiting friends at Providence College together, and they attended a party. They each claimed to have consumed one beer approximately two hours before the incident. At 1 a.m., Ferretti and Sheetz were sitting in Sheetz's car waiting for friends before they began their drive back home to Connecticut. Ferretti was sitting in the driver's seat and Sheetz was sitting in the passenger's seat, when a smaller vehicle pulled up alongside Sheetz's car. The driver of the smaller vehicle stopped to talk with someone, whom the women could not see, on the other side of the street. A larger vehicle then pulled up behind the smaller vehicle. Ferretti described the larger vehicle as a

"greenish-blue" Jeep, "like an SUV." Sheetz similarly described the larger vehicle as an SUV. When asked the color of the SUV, Sheetz first stated that she did not recall, then subsequently stated, "It was light-colored, I believe."

Then, a heated argument between the occupants of the two vehicles erupted. Ferretti testified that the SUV honked at the smaller car, and the man in the smaller car exited his vehicle and "mouth[ed] off" at the SUV driver. Ferretti then saw someone exit the SUV, but she did not recall from which door he exited. Sheetz testified that both drivers were outside of their vehicles during the argument. Both Ferretti and Sheetz then witnessed an occupant of the SUV fire several gunshots in the direction of the smaller vehicle. Ferretti testified that, once the gunshots began, she and Sheetz put their seats back and made no further observations. Sheetz, however, recalled that when Ferretti told her "to get down," she did not duck immediately, but instead continued to watch as the shooter entered the passenger-side door of the SUV and the vehicle drove off.

Ferretti testified that the shooter was a tall, average-build, African-American male with a black beard who was wearing a dark-colored sweatshirt and a dark-colored beanie. Sheetz described the shooter as "very tall," with a muscular build, a "light African-American" skin tone, and wearing a "dark jacket, navy blue probably, or black" with no hood, and a beanie hat. Sheetz described the shooter's face as round with facial hair and noted that her opportunity to observe the shooter's face was "okay." When Ferretti was asked if she "g[o]t a good look at [the shooter's] face," she testified "Yes" and described the viewing conditions as well-lit under the street lamps. Ferretti further testified that she observed the shooter for the "entire time that he * * * walked out of his car and shot at the [victim,]" which lasted approximately one minute or

less. Sheetz, however, was uncertain regarding the length of the incident, but indicated that she observed the shooter for a few minutes.

Ferretti and Sheetz both spoke to officers at the scene following the shooting and then were transported to the Providence police station. Approximately one hour after the shooting, Ferretti and Sheetz were driven separately to another location to participate in two discrete show-up identifications. Ferretti recalled that, prior to the show-up, Detective Ronald Riley, Jr. informed her that "[the suspect] was going to come out of the police car that they had put him in, and we were just going to look at him and see if we recognized him." When they arrived to the show-up location, Ferretti sat in a police vehicle wearing her contact lenses and viewed the suspect, without any problem, from approximately thirty-one feet away. The suspect was removed from a marked police cruiser without handcuffs and under spotlights. Ferretti testified that there were approximately five officers present at the show-up who were either standing near the suspect or sitting inside the six marked police cruisers parked close by. Ferretti identified the suspect as the shooter, had "no doubt" in her identification, and, in particular, recognized the suspect's dark-colored sweatshirt and his beard, and noted that he had the "same face" as the shooter. During the pretrial hearing, Ferretti identified defendant in the courtroom as the shooter.

Prior to the show-up with Sheetz, Detective Robert Melaragno informed her that she would be viewing "a possible suspect" and instructed her "that * * * if [she] knew who he was, to identify him." While sitting in a police cruiser, Sheetz observed a suspect, well-lit by the cruiser spotlights, from approximately thirty feet away. Sheetz observed two or three officers near the suspect, but she could not recall if there were others in the vicinity. She testified that she "knew it was him when [she] saw him" and that "[h]e was the exact same person as the man

from the shooting. He was the same height, same build, same outfit, same face." During the pretrial hearing, Sheetz stated that she had no doubt that it was the same person; however, during the show-up, she had told Det. Melaragno that she was only 90 percent certain. She testified that she had slightly minimized her expression of certainty during the show-up because she "didn't want to be wrong," but testified that she "think[s] that [she] was always sure." On cross-examination, when asked why her disposition changed from uncertain to certain, Sheetz explained that she "had time to think about it." During the pretrial hearing, however, Sheetz was unable to identify defendant in the courtroom as the shooter.

### Testimony of Patrolman Matthew McGloin

Patrolman Matthew McGloin had been a member of the Providence police department for six years. On the night of the shooting, Officer McGloin heard a radio broadcast regarding a shooting on Huxley Avenue that referenced a license plate that he subsequently determined to be actively registered to defendant. In an effort to locate defendant, he researched defendant's visitor list from an earlier incarceration, which included defendant's girlfriend's Providence address. Officer McGloin and Patrolman Sean Lafferty then proceeded to that address to investigate. Upon arrival, Officer McGloin observed a pickup truck with the engine running parked on the street adjacent to the residence. The officers drove by the pickup truck, shined a spotlight inside, and recognized the driver to be Sterling Washington.[2]

After surveilling the residence, the officers followed as Sterling Washington and an unidentified passenger drove away in the pickup truck. The officers attempted to stop the pickup

---

[2] The defendant noted in his brief that the familial relationship between Sterling Washington and defendant is unclear from the record. The state indicated that, following the shooting, Bazquez identified Sterling Washington, through a photo array, as the driver of the SUV. At trial, Basquez testified that he had "picked out the gentleman that [he] argued with [at the scene]" from the photo array.

truck; the pickup truck slowed down but failed to stop, and the unidentified occupant jumped out and ran. Officer McGloin recognized that person to be defendant. After radioing for backup assistance, Officer McGloin and Officer Lafferty chased defendant on foot. Later testimony at trial revealed that the officers had directed defendant to stop, eventually tackled him, placed him in handcuffs, and took him into custody.

### Testimony of Detective Ronald Riley, Jr.

Detective Ronald Riley, Jr., a member of the Providence police department, had been a detective for seven-and-a-half years. Detective Riley had responded within five minutes of the police radio broadcast reporting the shooting on Huxley Avenue. At the scene, Det. Riley spoke to witnesses Ferretti and Sheetz. After Ferretti and Sheetz had been transported to the police station,[3] Det. Riley learned that a suspect had been apprehended. Approximately ninety minutes after the shooting, Det. Riley drove Ferretti to the show-up location. Prior to conducting the show-up, Det. Riley instructed Ferretti that "she was going to be viewing an individual and if she recognized that individual, to tell [him] so." Detective Riley further testified that, under street lights and alley lights, the suspect was removed from the back of a police cruiser, was standing approximately twenty-five to thirty feet away from Ferretti, was not handcuffed, and was illuminated by cruiser spotlights. Detective Riley noted that Ferretti positively identified the suspect as the shooter.

---

[3] Detective Riley testified at trial that, prior to the show-up, Ferretti had provided him with a description of the shooter indicating that he was a "black male, approximately six feet tall, wearing dark clothes, dark hoodie, and a darker-colored beanie * * * [with] not a full beard, but a beard"; however, Ferretti's description was not recorded until after the show-up procedure had taken place.

**Testimony of Detective Robert Melaragno**

Detective Robert Melaragno testified that he had been a member of the Providence police department for twenty-one years and a detective for sixteen years. On the evening of the shooting, Det. Melaragno was tasked with transporting Sheetz to the show-up at approximately 2:30 a.m. Prior to the show-up, he instructed Sheetz that "we were going to view an individual, and she was to view [the suspect] and tell [him] if she recognized [the suspect]." When Det. Melaragno arrived with Sheetz to the show-up location, his vehicle's high beams were trained on the area where the suspect would be presented for identification, approximately twenty to twenty-five feet away. The defendant was removed from the back seat of a police cruiser, without handcuffs, and was surrounded by one or two officers, with other officers in the area. He testified that Sheetz identified the suspect as the shooter and noted that she was 90 percent certain in her identification. After transporting Sheetz back to the police station, Det. Melaragno obtained a recorded statement from her.

**Trial Justice's Decision**

After hearing the testimony of the aforementioned witnesses, the trial justice rendered a decision on defendant's motion to suppress the identifications made by Ferretti and Sheetz. The trial justice found that the show-up procedures were marred by "some suggestivity[.]" He concluded, however, that the witnesses' identifications were nonetheless admissible because the suggestiveness of the identifications was "overcome by the reliability and the independent memories of the two witnesses."

**2**

**Admissibility of the Recording of the 911 Call**

During the same pretrial hearing, defendant also contested the admissibility of a recording of a 911 call purporting to provide the license plate number of the shooter's vehicle.[4] The defendant argued that the 911 call was inadmissible because it did not fall under any of the exceptions to the hearsay rule. Specifically, defendant contended that the recording provided no foundation to find that the anonymous caller personally observed the license plate. Ultimately, the trial justice found that the caller "was a percipient witness" to the license plate because he identified the buildings on campus located in the vicinity of the shooting, indicated that he heard gunshots, demonstrated a sense of urgency due to the frightening circumstances. In addition, the trial justice also pointed out that the caller stated "I need you to get here" and the call was received at the time of the shooting. The trial justice determined that no evidence supported defendant's argument that the caller did not personally observe the license plate. The trial justice found that the caller's statements about the license plate indicated that he did, in fact, see the license plate. Accordingly, the trial justice found that the 911 call satisfied the requirement for the excited-utterance exception to the hearsay rule and deemed it admissible.

**C**

**Trial**

The trial began on December 2, 2015. On December 8, 2015, a jury convicted defendant of four counts: count 1, carrying a firearm without a license in violation of G.L. 1956 § 11-47-8(a); count 2, assault with a dangerous weapon by discharging a firearm and causing injury to Rudy Basquez in violation of § 11-47-3.2(b)(2); count 3, possession of a firearm with a previous

---

[4] The license plate number provided in the 911 call was in fact not completely accurate in that it was missing one digit.

- 9 -

federal court conviction in violation of § 11-47-5; and count 4, assault with a dangerous weapon in violation of G.L. 1956 § 11-5-2. Thereafter, defendant was sentenced to a total of sixty years to serve, with twenty years nonparolable. Approximately one week later, defendant filed a motion for a new trial, which was denied. Then, on March 8, 2016, defendant filed a notice of appeal to this Court and argued that the trial justice erred in denying his motion to suppress the show-up identifications and in admitting the anonymous 911 call into evidence.

**D**

**Remand Hearing**

Over a year later, on April 18, 2017, according to an affidavit from an assistant public defender, the Public Defender's office spoke with a Providence College student who identified himself as Chase Rasch. During the phone call, Rasch informed the Public Defender's office that he had called 911 on the night of the shooting, had not seen the license plate himself, and had spoken with a state prosecutor prior to trial, during the summer of 2015.[5] This phone call with Rasch prompted defendant to file in this Court a motion to hold the appeal in abeyance and remand the matter to the Superior Court on April 28, 2017, alleging that the state had committed a *Brady* violation by not disclosing this pretrial phone call with Rasch.

The defendant's first memorandum in support of his motion to remand alleged that the state failed to disclose material and exculpatory evidence related to the 911 call, in violation of defendant's right to due process under both the Rhode Island and United States Constitutions. The defendant contended that the state withheld the following information: (1) the state's phone call with the 911 caller prior to trial; (2) the identity of the 911 caller; (3) Rasch's interactions with police at the scene, namely that he provided police with his name and contact information;

_____

[5] It was later revealed that the 911 caller's name is Stephen Charles Rasch.

- 10 -

and (4) the fact that the state decided not to call Rasch as a witness at trial, list him in discovery, or disclose his identity.

Then, in a second memorandum submitted to this Court, defendant indicated that, on May 1, 2017, according to an affidavit from a second assistant public defender, the Public Defender's office spoke again with Rasch. According to that affidavit, Rasch called to make a correction to his previous statement: he had actually spoken with the prosecutor during the week of Thanksgiving 2015—immediately preceding defendant's trial—and not during the summer of 2015, as he had previously reported.

On May 15, 2017, this Court denied defendant's motion to hold the appeal in abeyance, but granted his motion to remand and ordered that a hearing on defendant's *Brady*-related motion for a new trial take place in the Superior Court within ninety days.

## 1

### *Brady* Violation

On remand, a hearing on defendant's *Brady*-related motion for a new trial took place on June 19, 2017, before the same trial justice who presided over defendant's trial. *See Brady v. Maryland*, 373 U.S. 83 (1963). At the hearing, the following testimony and documentary evidence was presented.

### Testimony of Special Assistant Attorney General Peter Roklan

Special Assistant Attorney General Peter Roklan testified that he had been a special assistant attorney general for more than ten years. He indicated that the recording of the 911 call was requested on November 18, 2015, twelve days prior to the scheduled trial date. He explained that a few weeks prior to trial, Special Assistant Attorney General Joseph McBurney joined the prosecutorial team, noticed that the 911 recording was not in the case file, and ordered

it immediately. Roklan testified that he was not seeking any particular information from the 911 recording, but that "[i]t was just something that [they] realized [they] didn't have." He testified that the state received the 911 recording on November 23, 2015, and sent it to defense counsel the following day, November 24, which was two days before the Thanksgiving holiday and one week prior to trial. During the afternoon of November 24, Roklan dialed the 911 caller's phone number and spoke to someone. Roklan explained that the individual did not provide a name or "anything of substance[,]" and only relayed that "they wanted nothing to do with the case." He did not recall much of what was said during the seven-minute and forty-two-second phone call, only that he came away unsure as to whether the individual was in fact the 911 caller. Roklan maintained that he did not learn that another person was on the scene with the 911 caller during the phone call, reasoning that, if he had, he would have pursued that person as a potential witness.

Roklan testified that he had no explicit recollection of informing defense counsel about the phone call, but noted, "I think we talked about it, but I don't have a specific memory of ever saying that we actually reached someone." In addition, he stated that the fact he had reached someone was "not something that we were trying to hide or not tell [defense counsel]." Roklan further noted that the 911 call was not essential evidence to the state's case because they had still intended to proceed to trial without it.

### Testimony of Stephen "Chase" Rasch

When Rasch testified at the remand hearing, he was a rising senior at Providence College originally from Dallas, Texas. When the shooting occurred, he was a nineteen-year-old freshman. Rasch's testimony and interviews with police shortly before the remand hearing confirmed that he was indeed the anonymous 911 caller from the night of the shooting and that

- 12 -

he did not see the license plate, but rather was relayed the license plate number by Alberto Batista. He explained that he had been willing to, and did, speak with police at the scene, but was steadfast in his opposition to testifying at trial.

A year after the shooting, on November 24, 2015, Rasch had received a phone call from Roklan. At the time, Rasch was on his way to the airport to return to Dallas for the Thanksgiving holiday break from school. He testified that Roklan identified himself when he called and explained that he worked at the Attorney General's office. Rasch confirmed that he was scared, utterly shocked, nervous, caught off guard, and confused when he answered Roklan's phone call because he had been under the impression that his 911 call was anonymous. He further testified that he was not cooperative and noted that traveling to the airport was "a stressful time." Rasch did not recall whether Roklan asked if he was the 911 caller or for his name. Rasch did recall telling Roklan that he was with another individual at the scene of the shooting, but noted that he did not provide Roklan with that individual's name or any other information about that individual. Rasch testified that he took down Roklan's name and telephone number and, after the call concluded, immediately texted the information to Batista, the individual present at the scene with him. Rasch consistently maintained that he did not want to testify and was afraid of being a witness at trial. Rasch stated, "I can tell you with certainty, I did not give [Roklan] any of my information or in any way that would cause me to have to be a witness within the trial."

Rasch did not speak with Roklan about the license plate during that phone call because he did not even realize that he had provided a license plate number during his 911 call until Gil Wilson, a Texas-based private investigator hired by defendant's girlfriend, told him that he had. Rasch had spoken on the phone with Wilson at approximately 9 p.m. on March 17, 2017—St.

- 13 -

Patrick's Day—while he was with friends. Rasch provided Wilson with the name of the individual who accompanied him at the scene of the shooting, Batista. Then, approximately one week later, Rasch spoke on the phone with Edward Pelletier, a local investigator also contacted by defendant's girlfriend. Rasch informed Pelletier that, during his 2015 phone call with Roklan, he had declined Roklan's request to be a witness. He testified that the phone call from Roklan caught him "extremely off-guard," whereas, by the time he spoke with Pelletier, he was "well accustomed to receiving numerous phone calls on a daily basis" regarding the case and was therefore "more prepared to talk" about the shooting at that point in time.

In addition to speaking with Wilson and Pelletier, on April 18, 2017, Rasch spoke on the phone with two attorneys from the Public Defender's office. On May 1, 2017, Rasch called the Public Defender's office to provide the text messages that he had sent to Batista immediately following his phone call with Roklan and to correct his previous statement regarding the timing of the phone call with Roklan. He informed the Public Defender's office that his phone call with Roklan took place before Thanksgiving, the week prior to trial, and not during the summer of 2015, as he had previously stated.

On May 1 and 2, 2017, Detective Angelo A'Vant of the Providence police department conducted two in-person, recorded interviews with Rasch. During the interviews, Rasch indicated that he did not disclose Alberto Batista's name to Roklan, nor did he disclose the fact that it was Batista who saw the license plate, not Rasch. Rasch described himself as "standoffish" during the call with Roklan. He noted that, because he feared that he would have to testify at trial, he made it clear to Roklan that he did not want to be part of the case.

**Testimony of Special Assistant Attorney General Joseph McBurney**

Special Assistant Attorney General Joseph McBurney testified that he became involved in the case on November 16, 2015, approximately two weeks prior to trial. He noted that Rasch had not been included in the state's case file and was never mentioned in his conversations with the lead detective in the case.

In preparation for the pretrial motions, McBurney and Roklan decided that Roklan would handle defendant's motion to suppress the show-up identifications because Roklan was more knowledgeable about the eyewitnesses; and McBurney would handle defendant's motion *in limine* to exclude the 911 call because he was more skilled at legal research in that area. At trial, McBurney conducted the examination of Michael Pickering, the victim's brother, who had provided police with three potential license plate numbers for the shooter's vehicle at the scene, and Officer Thomas Richards, who spoke with Pickering at the scene about the license plate numbers. Based on Officer Richards' police report, McBurney had assumed that Pickering had seen the license plate himself; however, McBurney later learned from defense counsel that Pickering had obtained the possible license plate numbers from other unknown sources at the scene.

In regard to Roklan's pretrial phone call with Rasch, McBurney testified that, although he was unsure when it had occurred, he had "a recollection of telling [defense counsel] that we got an individual who was uncooperative, [and] wouldn't give a name." He further recalled that, in response, defense counsel informed him that her investigator encountered the "same problems." McBurney further added in his testimony that the individual that Roklan spoke with had not indicated whether he was in fact the person who made the 911 call. McBurney also acknowledged that, during the hearing on defendant's motion *in limine* to exclude the 911 call,

- 15 -

he did not inform the trial justice that the state had reached someone by dialing the 911 caller's phone number, but explained that such a disclosure was not warranted because the phone call had revealed only an anonymous person who did not want to provide any information. McBurney noted that, if he had learned the caller's name and that he was a student at Providence College, he would have sought a subpoena for his testimony.

### Testimony of Assistant Public Defender Sarah Potter

Assistant Public Defender Sarah Potter testified that she had been employed by the Public Defender's office for eight years and had worked on this case from its inception. On October 29, 2015, Potter learned that Pickering did not personally observe the license plate at the scene, but that he had been relayed the potential license plate numbers from unknown sources at the scene. Potter shared that information with Roklan in a passing conversation in the hallway of the courthouse at some point before the originally-scheduled trial date. She testified that neither Roklan nor McBurney informed her that Roklan had reached someone at the 911 caller's phone number prior to trial.

During the hearing on defendant's motion *in limine* regarding the admissibility of the 911 call, Potter informed the trial justice that she and an investigator for the Public Defender's office had attempted to call the phone number associated with the 911 call, but were unsuccessful in reaching the caller. She had instructed the investigator not to leave a voice mail, so as not to "spook" the caller. It was not until sometime after defendant's case was on appeal that Potter learned the identity of the 911 caller. Potter also testified that, after the appeal had been docketed, Roklan informed her, in another passing conversation, that Rasch's father had contacted the Attorney General's office.

**Trial Justice's Decision**

In a later written decision, the trial justice fully credited Roklan's testimony that he did not learn from the pretrial phone call whether Rasch was in fact the 911 caller nor did he learn that another individual accompanied Rasch at the scene. The trial justice did not deem credible Rasch's testimony. Accordingly, the trial justice determined that the state did not commit a *Brady* violation, and he denied defendant's *Brady*-related motion for a new trial.

**2**

**Recusal Motion**

Following the hearing on the *Brady*-related motion for a new trial, but prior to the trial justice's issuance of his decision, defendant filed a motion requesting the recusal of the trial justice, and a hearing was held before the same justice. The defendant's recusal request was based on the fact that McBurney had been working on another case with the trial justice's daughter, a special assistant attorney general, in what was scheduled to be her first jury trial. The defendant deemed this significant because defendant alleged that, in deciding the *Brady*-related issue, the trial justice was tasked with weighing McBurney's credibility against Potter's credibility because McBurney had testified that he told Potter about the state's pretrial phone call with Rasch, and Potter testified that the state had not. Therefore, defendant argued that McBurney's professional association with the trial justice's daughter created an appearance of impropriety even though the case on which they had been working had been resolved on the day of the recusal hearing and prior to the issuance of the trial justice's decision on defendant's *Brady* allegations.

In his decision, the trial justice found that defendant failed to identify the correct "credibility contest" at issue in the case. He found that his examination of the testimony at the

remand hearing was not based on a "credibility contest" between McBurney and Potter, but instead rested on his assessment of Rasch's credibility. He further explained that his evaluation of Rasch's testimony was determinative because, if Rasch did not relay to Roklan any information that would trigger a *Brady* violation, then defendant's motion was meritless. He proffered that, if a credibility comparison was necessary, then that comparison was between Roklan and Rasch, not McBurney and Potter. In addition, the trial justice found that defendant failed to put forth any evidence demonstrating the existence of any judicial bias. The trial justice also questioned the timing of defendant's motion—filed after the remand hearing—and surmised that defendant was merely judge-shopping. Accordingly, he denied defendant's recusal motion.

## II

### Issues on Appeal

Following the trial justice's decisions on remand, the case was once again before this Court on appeal. The defendant asserts several arguments on appeal. He maintains that the trial justice erred by: (1) denying his motion to suppress the two show-up identifications; (2) admitting the recording of the 911 call at trial; (3) "failing to implement the letter and spirit of this Court's remand order"; (4) failing to find that the state had committed a *Brady* violation; and (5) denying defendant's motion to recuse.

### A

### Show-Up Identifications

The defendant contends that the two show-up procedures were impermissibly suggestive. Under our well-established jurisprudence, the inquiry to determine whether an identification procedure, such as a show-up, violated a defendant's right to due process of law is a two-step analysis. *See State v. Texter*, 923 A.2d 568, 573 (R.I. 2007). First, the trial justice must

- 18 -

determine whether the show-up was unnecessarily suggestive. *Id.* at 574. If the trial justice finds that the show-up was unnecessarily suggestive, then he or she must look at the totality of the circumstances to determine whether the identification was nevertheless reliable. *Id.*

The defendant asks this Court to adopt a rule embraced by the Wisconsin Supreme Court requiring suppression of an identification absent a showing of exigency or necessity.[6] Specifically, he avers that use of the show-up procedure was unnecessary here because police had probable cause to arrest defendant prior to the show-ups; he points out that "the shooter escaped in a car registered to [defendant,]" defendant was located by the police "nearby" the scene of the shooting, and defendant "tried to evade the police." In the alternative, defendant asks this Court, under the second step of the analysis, to hold that the factors in *Neil v. Biggers*, 409 U.S. 188 (1972), traditionally employed by this Court, fail to accurately assess reliability.[7] *See State v. Patel*, 949 A.2d 401, 412 (R.I. 2008); *see also Biggers*, 409 U.S. at 199. In support of his argument, defendant urges this Court to join Massachusetts[8] and New York[9] in finding "an unduly suggestive procedure [that] results in identification" *per se* excludable, thereby negating the second step of the analysis. Lastly, defendant argues that, even if this Court continues to

---

[6] *See State v. Dubose*, 699 N.W.2d 582, 596, 599 (Wis. 2005) (holding that evidence obtained from a show-up is not admissible unless the show-up was necessary and that a show-up is not necessary unless (1) the police lacked probable cause to make an arrest or (2) exigent circumstances prevented use of a photo array or lineup).

[7] The *Neil v. Biggers*, 409 U.S. 188 (1972), factors include:

> "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199.

[8] *See Commonwealth v. Johnson*, 650 N.E.2d 1257, 1261 (Mass. 1995).

[9] *See People v. Adams*, 423 N.E.2d 379, 384 (N.Y. 1981).

- 19 -

utilize both steps of the analysis, the identifications by Ferretti and Sheetz were unreliable under the second step.

### 1

### Standard of Review

When reviewing a motion to suppress, we "will not overturn a trial justice's factual findings unless they are clearly erroneous." *State v. Harrison*, 66 A.3d 432, 441 (R.I. 2013). In our review of any alleged constitutional violation, we "must make an independent examination of the record to determine if [the defendant's] rights have been violated." *Id.* (quoting *State v. Goulet*, 21 A.3d 302, 311 (R.I. 2011)). This independent examination requires this Court to "view the evidence in the record in the light most favorable to the state." *State v. Santos*, 64 A.3d 314, 319 (R.I. 2013) (quoting *Goulet*, 21 A.3d at 311).

### 2

### Analysis

In his consideration of the first step of the two-step analysis, the trial justice found that "some" suggestiveness existed in the show-up procedures employed by the police in the present case. The trial justice pointed out that defendant "was brought from a cruiser, spotlighted, there were other officers around[,]" and the witnesses testified that "they assumed that they were going to see a suspect." As additional evidence of suggestiveness, defendant refers to the Providence police department's deviation from its own policy governing show-up identifications.[10] The Providence police department's policy instructs that officers conducting show-up identifications

---

[10] In 2010, the Rhode Island General Assembly enacted G.L. 1956 § 12-1-16, which created a task force composed of members of the criminal justice community charged with "develop[ing] guidelines for policies, procedures and training with respect to the collection and handling of eyewitness evidence in criminal investigations by law enforcement agencies in Rhode Island." The Providence police department codified an order that includes several of the task force's recommendations. General Order 360.08 (2013).

should not display to the witness a suspect detained in a department vehicle. It further directs officers to give the witness four specific instructions before he or she views the suspect.[11] Here, defendant was presented to both Ferretti and Sheetz after he was removed from a marked squad car, and neither Ferretti nor Sheetz received explicit instructions pursuant to the department's policies. Detective Riley instructed Ferretti that "she was going to be viewing an individual and if she recognized that individual, to tell [him] so." Detective Melaragno instructed Sheetz that "we were going to go, and we were going to view an individual, and she was to view him and tell [Det. Melaragno] if she recognized him." Although we underscore the importance of the task force's efforts, recognize the dangers associated with eyewitness identification, and encourage the Providence police department to follow its internal procedures, the department's departure from those procedures does not require exclusion of evidence at trial under Rhode Island law if the identifications were nonetheless reliable. *See State v. Gallop*, 89 A.3d 795, 803 n.6 (R.I. 2014) (noting that the failure to follow policies and procedures created pursuant to G.L. 1956 § 12-1-16 does not necessarily render an identification procedure constitutionally deficient); *Patel*, 949 A.2d at 412 (holding that independently reliable identifications can be admitted into evidence even if suggestive in nature).

---

[11] General Order 360.08, the subject title of which is "Eyewitness Investigation: Photographic Line-Ups, Physical Line-Ups & Show-Ups," sets forth the following procedure, in pertinent part:

> "Prior to the show-up, Department personnel shall provide the following instructions to the victim/witness and ask the victim/witness if he/she understands same:
> "a. That the suspect being detained may or may not be the perpetrator;
> "b. That it is just as important to clear an innocent person from suspicion as to identify guilty parties;
> "c. That the victim/witness should not feel compelled to make an identification; and
> "d. Regardless of whether an identification is made, the investigation will continue." General Order 360.08 III.A.4.

The trial justice, finding "some suggestivity" in the show-up identification procedures in this case, continued on to the second step of the analysis to determine, based on the *Biggers* factors, whether the identifications were nonetheless reliable. The *Biggers* factors include: (1) the witness's opportunity to observe the suspect at the time of the crime; (2) the witness's level of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the witness's certainty in his or her identification at the time of the confrontation; and (5) the amount of time that elapsed between the crime and the identification procedure. *Patel*, 949 A.2d at 411. Although this Court has traditionally employed the *Biggers* factors in its analysis, *see id.*, defendant instead encourages this Court to adopt an exigency or necessity requirement that must be met before police can utilize a show-up identification procedure. The defendant also cites to Massachusetts and New York cases to support his argument that Rhode Island should reject the totality-of-the-circumstances approach set forth in *Biggers* and adopt a rule that an impermissibly suggestive identification is *per se* excludable.

We note, however, that "[t]his Court never has adopted a *per se* rule of exclusion when police officers have employed a procedure in which they show * * * a single individual to a witness for the purpose of identifying a suspect." *Patel*, 949 A.2d at 411. "We have expressly stated that such a *per se* rule would 'often frustrate rather than promote justice in situations wherein an identification is reliable despite its unnecessarily suggestive nature.'" *Texter*, 923 A.2d at 574 (quoting *State v. Turner*, 561 A.2d 869, 871 (R.I. 1989)). "Moreover, as this Court has previously indicated, the prosecution is not required to demonstrate that exigent circumstances existed which necessitated the use of a show-up procedure rather than another type of procedure." *Id.*; *see also Patel*, 949 A.2d at 411 (concluding that "we never have required the state to show evidence of exigency when [a show-up] procedure is used"). Thus, we

continue to look to the *Biggers* factors to determine whether the identification was independently reliable.

The first factor the trial justice considered was the witnesses' opportunity to observe the suspect at the time of the crime. The trial justice heard testimony from both Ferretti and Sheetz regarding their opportunity to observe the shooter during the commission of the crime. Ferretti had been sitting in the driver's seat of Sheetz's car, with Sheetz in the passenger's seat, when her attention was drawn to an argument between occupants of two cars. Once the gunshots began, Ferretti recalled that she and Sheetz put their seats back and she could no longer see what was happening outside. Sheetz testified that, despite Ferretti directing her to get down when the gunfire started, she continued to watch and "didn't get down immediately." With respect to Ferretti's testimony that she observed the shooter for one minute, the trial justice concluded that one minute "is a fair amount of time[,]" particularly while both witnesses were staring at the shooter.

The trial justice next considered the second factor—the witnesses' level of attention. He found that each witness's degree of attention was "quite focused," as no distractions were present.

In regard to the third factor, defendant argues that the accuracy of both witnesses' descriptions of the suspect was tainted because the only recorded descriptions from the witnesses were taken after the show-up procedure and, therefore, were influenced by the witnesses' observations of defendant during the show-up. However, we note that, while this testimony was not elicited at the pretrial hearing, Det. Riley, who transported Ferretti to the show-up, testified at trial that, prior to the show-up, Ferretti provided him with a description of the shooter that matched defendant, but the description had not been recorded until after the show-up was

- 23 -

conducted. Detective Melaragno, who transported Sheetz to the show-up, testified that he had not spoken to Sheetz prior to the show-up because, before he had the opportunity to record a formal witness statement, he was notified that a suspect had been detained. He explained that "we wanted to go down and do the show-up prior to spending time doing the witness statement." The trial justice determined that "the general description[s]" given by Ferretti and Sheetz matched defendant.

Fourth, the trial justice analyzed the witnesses' degree of confidence in their identifications. The trial justice noted that the witnesses' level of certainty at the time of their identifications differed: Ferretti was undoubtedly certain and Sheetz was only 90 percent certain. The trial justice further noted that Ferretti's "certainty was demonstrable" and that, over time and with more thought, Sheetz testified at the pretrial hearing that she was certain of her identification. We note, however, that Sheetz's testimony regarding her increased certainty was elicited before she failed to identify defendant in the courtroom at the pretrial hearing.[12]

Fifth, the trial justice addressed the amount of time that had elapsed between the commission of the crime and the witnesses' identifications of the suspect. The trial justice found that this factor was not "of any great moment" in this case because the show-up occurred "within an hour or so" of the shooting.

After examining each of the five factors, the trial justice found that any suggestiveness surrounding the witnesses' identifications was "overcome by the reliability and the independent

---

[12] This Court is aware of studies that have proffered that a witness's confidence in his or her identification does not necessarily correlate with its accuracy. The defendant argues that a "witness's degree of certainty is least useful in determining reliability[,]" whereas the prosecution points out that the research is not conclusive. In the context of this case, even if the trial justice had treated this factor as neutral, it would not have affected his determination that the identifications were reliable in the totality of the circumstances. Suffice it to say that a witness's degree of certainty in an identification should be weighed with great caution.

memories of the two witnesses." We conclude that the trial justice, after considering the totality of the circumstances, was not clearly erroneous in his finding that the *Biggers* factors weighed heavily in the state's favor, thereby rendering both show-up identifications independently reliable and properly admitted at trial.

## B

## Admissibility of the Recording of the 911 Call

The defendant contends that the trial justice erred by allowing a recording of the then-anonymous 911 call to be admitted as evidence at trial. Specifically, defendant argues that the 911 call, which was admitted under the excited-utterance exception to the hearsay rule, lacks any indicators that the caller was a percipient witness to the SUV's license plate number relayed during the 911 call. On appeal, the state admits that "it appears that defendant's assessment of the 911 phone call prior to trial was correct: The 911 caller did not personally obtain the license plate number at the scene, but received it from a third-party witness." Therefore, the state "assumes *arguendo* that the recording constitutes inadmissible hearsay" and argues that the erroneous admission of the 911 call at trial nevertheless amounted to harmless error because the evidence was cumulative.

## 1

## Standard of Review

This Court reviews "a trial justice's decision regarding the admissibility of evidence pursuant to the excited-utterance exception to the hearsay rule under an abuse of discretion standard." *State v. Morales*, 895 A.2d 114, 118 (R.I. 2006). "It is well settled in this jurisdiction that '[a]ny decision made by a trial justice concerning the admission of excited utterances shall

not be overturned unless clearly wrong.'" *Id.* (quoting *State v. Krakue*, 726 A.2d 458, 462 (R.I. 1999)).

**2**

**Analysis**

In general, "[h]earsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *State v. Oliveira*, 961 A.2d 299, 314 (R.I. 2008) (quoting R.I. R. Evid. 801(c)). "Hearsay is not admissible except as provided by law." *Id.* The excited-utterance exception provides that "[a] statement that otherwise is hearsay is admissible if it 'relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *Id.* (quoting R.I. R. Evid. 803(2)). Further, for the excited-utterance exception to apply, "the declarant must have had firsthand knowledge of the event to which the utterance pertains" because "[e]xcitement alone, without the opportunity to observe, cannot meet the essential test of reliability." *State v. Dame*, 488 A.2d 418, 425 (R.I. 1985) (quoting *In re Kim*, 445 A.2d 295, 296, 297 (R.I. 1982) (concluding that in order for hearsay to be admitted under the excited-utterance exception as a reliable piece of evidence, the declarant must have personally made the observation).

At the time of the pretrial hearing, the 911 caller was an anonymous person and the trial justice admitted the evidence under the excited-utterance exception to the hearsay rule after listening to the recording and determining that the caller's statements during that call supported a finding, in his opinion, that the caller had seen the SUV's license plate. We perceive no abuse of discretion by the trial justice based on the information before him at that time. *See Morales*, 895 A.2d at 118. However, when the Public Defender's office spoke on the phone with Rasch one

- 26 -

year after trial, it came to light that Rasch was the anonymous 911 caller and did not personally observe the license plate; rather, the number was relayed to him by a third party. We shall therefore assume, as does the state, that the recording of the 911 call was inadmissible hearsay.

Consequently, we must determine whether the admission at trial of the 911 call as evidence of the SUV's license plate number warrants a new trial or whether it was harmless error. "[T]he admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when [the] defendant's guilt is sufficiently established by proper evidence." *State v. Watkins*, 92 A.3d 172, 189 (R.I. 2014) (quoting *State v. Robinson*, 989 A.2d 965, 979 (R.I. 2010)). "'[C]umulative evidence' is 'that which tends to prove the same point to which other evidence has been offered.'" *Id.* (quoting *Robinson*, 989 A.2d at 979). "The test to determine whether or not an item of evidence is cumulative 'is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point.'" *Id.* (quoting *Robinson*, 989 A.2d at 979).

The defendant argues that the admission of the 911 call was not harmless because it was the strongest evidence of the SUV's license plate number presented at trial. We disagree. The 911 call provided only additional cumulative evidence of the license plate number. At trial, the following evidence was presented regarding the SUV's license plate. After the SUV pulled away from the scene, Pickering, the victim's brother, called 911 and told the operator that the shooter was in a blue Volvo. Pickering also informed Officer Richards, with whom he spoke at the scene, that he had seen a blue Volvo SUV and provided three potential license plate number combinations relayed to Pickering by "a guy that came up to [him] and said that he got the plate * * *." Officer Richards then called the police dispatcher to determine if any of the three potential license plate numbers were a match for a blue Volvo SUV. The first two plate numbers

- 27 -

did not match Pickering's description of the vehicle, but the third was a match for a 2006 blue Volvo registered to defendant. The jury, therefore, could follow a trail of evidence that led from the license plate numbers that Pickering relayed to Officer Richards, to Pickering's description of the shooter's vehicle, to Ferretti and Sheetz's testimony that the shooter was an occupant of a blue-green SUV, to a blue 2006 Volvo registered to defendant. The evidence adduced at trial clearly pointed towards defendant, without the assistance of the inaccurate license plate number provided by Rasch's 911 call.

The defendant further contends that the recording of the 911 call "packed an emotional gut punch" at trial that was prejudicial to defendant because "the caller sounded like a distressed college student, terrified by this shooting on his campus." We note, however, that the 911 evidence was not the only time the jury heard from "terrified" students and eyewitnesses who were present at the scene of the shooting: the victim, his brother, Ferretti, Sheetz, and three students who were freshman at Providence College at the time of the shooting all testified at trial. Each of the student witnesses provided testimony that demonstrated the fear experienced by those who found themselves caught in the midst of the on-campus shooting. Pickering's testimony, as the victim's brother, was particularly emotionally charged as he described watching his brother suffer a gunshot wound and explained that he "thought [his] brother was dead." Therefore, we conclude that the emotional nature of Rasch's 911 call is cumulative in light of the other emotional testimony adduced at trial.

Additionally, defendant contends that the state's reference to the 911 call in its closing argument further demonstrates the import of the 911 evidence to the state's case and, thus, its prejudicial effect on defendant at trial. During its closing argument, the state reminded the jury that:

"We have that anonymous 911 phone call * * *. You heard that call. And, again, I urge you to listen to it upstairs. You can hear the person's voice. They're nervous. They're distressed. They're right there at the scene. They tell you which dorms are right there, Guzman and Davis. They're clearly there. They tell you that they heard the shots and that they have the license plate. You can hear it in the voice, I have the plate, he's trying to get the plate to the police. And what does he tell the police or what does he tell 911? 43862. He gives five digits. He doesn't give a full six digits. He's missing one. He's missing that second digit. The defendant's plate is 483-862. That 911 caller just missed that second digit, that 8."

Although the state's reference to the 911 call in its closing argument drew the jury's attention again to the 911 call, the evidence presented at trial indicated that defendant was identified by two eyewitnesses during show-ups, was located by police less than a mile from the shooting, and fled from police with Sterling Washington—a man identified in a photo array by the victim as the driver of the Volvo SUV in which the shooter escaped.

We are convinced that the 911 call was merely cumulative and harmless because defendant's guilt was sufficiently established by proper evidence. Thus, defendant was not unduly prejudiced by its admission, even if erroneous.

## C

### *Brady* Violation

We next consider defendant's post-judgment *Brady*-related motion for a new trial that was heard by the trial justice pursuant to this Court's remand order. The state's eleventh-hour request for the 911 call, less than two weeks before the trial was scheduled to commence, left both the state and defendant in a difficult position, as they separately attempted to reach the then-anonymous 911 caller days before trial, over the Thanksgiving holiday. The defendant was not successful in reaching the 911 caller and was under the impression that the caller remained

anonymous. Therefore, the only information regarding the 911 caller known to defense counsel prior to trial was that he was a male caller with a Dallas phone number.

Over one year after trial, while the appeal of this case was pending before this Court, the Public Defender's office spoke with Rasch, who indicated that he was the 911 caller and that he had spoken with a state prosecutor during the summer of 2015. Then, three days after defendant filed a motion to remand based on this information, the Public Defender's office had a second phone call with Rasch during which he corrected his previous timeline of events and indicated that he had spoken with the state prosecutor during his Thanksgiving holiday break from school, which was the week prior to trial. The defendant alleged in his papers in support of his remand motion that "the state *deliberately suppressed and misstated the facts * * *.*" Ultimately, after the hearing, the trial justice denied defendant's *Brady*-related motion for a new trial, finding that the state learned "absolutely nothing of value" during the pretrial phone call with Rasch.

On appeal, defendant makes several arguments in support of his allegation that the state's failure to disclose its pretrial phone call with Rasch violated *Brady*. He maintains that the trial justice erred by interpreting this Court's remand order as narrowly directing the Superior Court to review the matter for only a deliberate *Brady* violation. Moreover, he contends that the trial justice's finding that the state did not commit a deliberate *Brady* violation was an error. He avers that, even if the state's failure to disclose was not deliberate, the pretrial phone call was nonetheless favorable to defendant's case and material to the determination of his guilt, and the nondisclosure thereof constituted a *Brady* violation.

**1**

**Standard of Review**

"When reviewing a trial justice's decision with respect to whether a violation of Rule 16 or *Brady* occurred, this Court affords great deference to the trial justice and will not disturb that ruling unless he or she has committed clear error." *State v. McManus*, 941 A.2d 222, 229 (R.I. 2008). "We long have recognized that 'the trial justice is in the best position to determine whether any harm resulted from noncompliance with discovery motions * * *.'" *Id.* (quoting *State v. Brisson*, 619 A.2d 1099, 1102 (R.I. 1993)).

**2**

**Analysis**

"[T]he due process clause of the United States Constitution requires that the state provide a criminal defendant with certain information." *State v. Nickerson*, 94 A.3d 1116, 1125 (R.I. 2014) (quoting *McManus*, 941 A.2d at 229). "In accordance with *Brady*, if a prosecutor has suppressed evidence that would be favorable to the accused and the evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted." *Tempest v. State*, 141 A.3d 677, 682-83 (R.I. 2016) (quoting *DeCiantis v. State*, 24 A.3d 557, 570 (R.I. 2011)). To satisfy the degree of materiality necessary to establish a *Brady* violation, "a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 880 (R.I. 2001) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). However, materiality need not be demonstrated, and a new trial will be granted, if the state deliberately suppresses evidence. *McManus*, 941 A.2d at 229. We have held that "[t]he prosecution acts deliberately when it makes 'a considered decision to suppress * * *

for the purpose of obstructing' or where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'" *State v. Wyche*, 518 A.2d 907, 910 (R.I. 1986) (quoting *United States v. Keogh*, 391 F.2d 138, 146-47 (2d Cir. 1968)).

In determining whether a *Brady* violation occurred, the trial justice's analysis focused on specific facts in relation to the state's pretrial phone call with Rasch, which defendant alleged that the state failed to disclose. These alleged facts included: the identity of the 911 caller, Rasch's conversation with police at the scene during which Rasch provided his name and contact information, the pretrial phone call between Rasch and the state, the state's decision "not to call Mr. Rasch as a witness, list him in discovery, or disclose his identity to the defense[,]" and, in the alternative, the state's pretrial phone call "to an unknown individual who refused to cooperate."

With respect to whether the state learned the identity of the 911 caller during the pretrial phone call, the trial justice found that it was "inconceivable that Rasch, who so desperately wanted to conceal his identity in order to avoid becoming a witness in the case, would have revealed his name and contact information" to Roklan. He also pointed out that Rasch had testified during the remand hearing that he believed his 911 call was completely anonymous until he received the call from Roklan. In addition, the trial justice took note of Rasch's testimony that the first time he disclosed his identity as the 911 caller, and named Alberto Batista as the individual who was with him at the scene, was to private investigator Gil Wilson, after defendant had already been convicted. The trial justice noted "Rasch's numerous credibility failings throughout his testimony[,]" and particularly those in regard to whether he identified himself during the pretrial phone call or whether he informed Roklan about Batista's presence at the

- 32 -

scene. In contrast, the trial justice fully credited Roklan's testimony and found that Roklan obtained "absolutely nothing of value" from the call.

The trial justice further determined that any new information that defendant discovered after the Public Defender's office's phone calls with Rasch "was entirely unknown to the state before trial[.]" We agree that the testimony elicited at the remand hearing illuminated the phone call in a different light than that initially described by defendant in his papers submitted to this Court in support of his motion to remand. The defendant's preliminary characterization of the state's pretrial phone call with Rasch was likely a consequence of haste, lack of readily available information, and disconcerting suspicions as to why this phone call was not disclosed.

The defendant also contends, in the alternative, that, even if the state did not learn the 911 caller's identity or other pertinent information from the call, the fact of Rasch's unwillingness to cooperate with the state's case was nevertheless favorable information to defendant and this information could have been utilized by defendant at trial to impeach the 911 call evidence. The defendant further avers that, if his defense counsel had known that the state had successfully reached the 911 caller prior to trial, counsel would have further investigated the 911 call and pursued a continuance of the trial date.

The trial justice found that "[t]he other evidence produced at [defendant's] trial was simply too powerful to overcome." We are also of the opinion that evidence that the 911 caller was unwilling to testify at trial, even if used effectively by defense counsel to attack the anonymous 911 caller's credibility, would not have made "the difference between conviction and acquittal" in light of the totality of the evidence adduced at trial. *Tempest*, 141 A.3d at 685. Thus, Rasch's unwillingness to cooperate with the state is not material to defendant's guilt or punishment under a *Brady* analysis. *Id.* at 683.

- 33 -

Overall, the trial justice noted that, even if the state did fail to disclose the pretrial phone call to defendant, such nondisclosure was not made either "for the purpose of obstruction" or as "evidence which the state could possibly have recognized as 'high value' to the defense." In addition, he indicated that the pretrial phone call was "factually barren, entirely uninformative in every way, and not at all 'sufficiently central to the criminal case' to constitute 'material' information." The trial justice found "that there is no way by which this empty phone call would have supported any possibility—much less 'a reasonable probability'—that the results of this case would have been different * * * or that confidence in the outcome of this case would have been undermined." In sum, he noted that "the state's attorneys never concealed anything of material importance from the defendant, either deliberately or, for that matter, inadvertently."

We conclude that the trial justice did not clearly err in determining that the state did not commit a *Brady* violation. Accordingly, we affirm the trial justice's denial of defendant's *Brady*-related motion for a new trial.

**D**

**Recusal Motion**

The defendant also contends that the trial justice erred in denying the motion to recuse himself. Specifically, defendant argues that "a reasonable person would question [the trial justice's] ability to remain impartial" because Special Assistant Attorney General McBurney was set to mentor the trial justice's daughter, who was also a member of the Attorney General's office, in connection with an unrelated trial. He argues that this mentorship was particularly troubling because the crux of the *Brady*-related motion for a new trial was the trial justice's weighing of McBurney's credibility against Assistant Public Defender Potter's credibility. The defendant maintains that this credibility comparison surfaced when McBurney testified that he

told Potter about the state's pretrial phone call and Potter testified that she did not recall the same.

## 1

## Standard of Review

When a party argues on appeal that a trial justice should have recused himself or herself due to bias or prejudice, we must "scrutinize closely whatever is asserted to have disclosed prejudice of a character and in such degree as to work a disqualification." *State v. McWilliams*, 47 A.3d 251, 257 (R.I. 2012) (quoting *State v. Howard*, 23 A.3d 1133, 1135-36 (R.I. 2011)).

## 2

## Analysis

We have held that "[t]he party seeking recusal bears the burden of establishing that 'the judicial officer possesses a personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment.'" *Howard*, 23 A.3d at 1136 (quoting *Mattatall v. State*, 947 A.2d 896, 902 (R.I. 2008)). In addition, "justices have an equally great obligation **not** to disqualify themselves when there is no sound reason to do so." *McWilliams*, 47 A.3d at 260 (emphasis in original) (quoting *State v. Mlyniec*, 15 A.3d 983, 999 (R.I. 2011)). "To prevail on a recusal motion based on bias, a party must show that there are facts present such that it would be 'reasonable for members of the public or a litigant or counsel to question the trial justice's impartiality.'" *In re Jermaine H.*, 9 A.3d 1227, 1230 (R.I. 2010) (quoting *In re Antonio*, 612 A.2d 650, 653 (R.I. 1992)).

The trial justice concluded that the heart of the *Brady*-related motion for a new trial was Rasch's credibility and not "a credibility contest" between McBurney and Potter as defendant had maintained. He determined that his assessment of the *Brady* motion required an examination

of Rasch's testimony to determine what information was disclosed to Roklan during the pretrial phone call and whether the state's failure to disclose that information violated *Brady*. The trial justice found that defendant failed to meet his "substantial burden" of proving judicial bias, *see In re Jermaine H.*, 9 A.3d at 1230, and noted that a trial justice should not recuse himself or herself unless there is sound reason to do so. *See Kelly v. Rhode Island Public Transit Authority*, 740 A.2d 1243, 1246 (R.I. 1999). We agree.

We are satisfied that the defendant has failed to put forth any facts establishing a personal bias, prejudice due to a preconceived opinion, or any reason for a member of the public to question the trial justice's impartiality, aside from the defendant pointing out that McBurney and the trial justice's daughter were both special assistant attorneys general who worked in the Attorney General's office and had a professional relationship that might have been akin to that of a supervisor-supervisee. *See Mlyniec*, 15 A.3d at 1000 ("[R]ecusal is not in order by a mere accusation that is totally unsupported by substantial fact.") (quoting *State v. Clark*, 423 A.2d 1151, 1158 (R.I. 1980)). It is insufficient for the defendant to merely allege that there was an appearance of impropriety because one of the prosecutors in the defendant's case had a working relationship with the trial justice's daughter, without asserting any supporting evidence that would demonstrate judicial bias. Thus, the defendant has failed to meet the "substantial burden" required to prevail on a recusal motion. *In re Jermaine H.*, 9 A.3d at 1230 (quoting *In re Shawn B.*, 864 A.2d 621, 624 (R.I. 2005)). Accordingly, we affirm the trial justice's denial of the defendant's recusal motion.

## III

## Conclusion

This case no doubt represents an unfortunate chapter in the annals of Rhode Island's criminal justice system. The integrity and credibility of a number of assistant attorneys general and assistant public defenders have been besmirched, and the impartiality of a thirty-year trial justice has been brought into question. We decline to enter into this fray, other than to observe that we have the highest respect for the men and women who labor diligently and daily in our criminal courts. And we will continue to have such regard until we are presented with convincing evidence that our esteem is ill-founded.

We understand that, in the course of zealous advocacy, passions may become inflamed and accusations may be improvidently made. Rhode Island, however, has long forsworn the battle cry of "victory at any cost" in favor of "justice at any price." We expect our attorneys not only to adhere assiduously to our rules and procedures, but also to practice before our courts with complete candor. The goal of every criminal trial must always be to obtain a just result.

For the reasons set forth herein, we affirm the judgment of conviction and remand this case to the Superior Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Willie Washington. |
| **Case Number** | No. 2016-151-C.A. (P2/15-1538AG) |
| **Date Opinion Filed** | June 29, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Department of Attorney General<br>For Defendant:<br><br>Kara J. Maguire<br>Office of the Public Defender |